Terrence DONOHOE, et al., Plaintiffs,

v.

CONSOLIDATED OPERATING &
PRODUCTION CORPORATION,
et al., Defendants.

No. 86 C 7543.

United States District Court,
N.D. Illinois, E.D.

April 10, 1990.

Herbert Beigel, Lewis S. Sandler, Bruce Rose, Beigel & Sandler, Chicago, Ill., for plaintiffs.

Douglas P. Roller, Clifford E. Berman, Rooks, Pitts & Poust, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Terrence Donohoe ("Donohoe") and 53 other investors in one or more of a series of oil and gas limited partnerships have filed a nine-count Fourth Amended Complaint (the "Complaint") against Consolidated Operating & Production Corporation ("COPCO"), its sole principals and shareholders Jack Nortman ("Nortman"), Morando Berrettini ("Berrettini") and Dennis Bridges ("Bridges"), and Bridges' wholly owned and operated corporations Ona Drilling Corporation ("Ona") and Onshore Rig Corporation ("Onshore").[1] Plaintiffs allege several violations of the federal securities laws' anti-fraud provisions and registration requirements, violation of Illinois state securities laws, common law fraud, breach of fiduciary duty and two types of RICO violations.

After both sides had completed extensive discovery, Nortman, Berrettini and COPCO have moved under Fed.R.Civ.P. ("Rule") 56(b) for summary judgment on all counts. Briefing on that motion has now been completed, and this Court has reviewed the truly massive submissions by both sides.[2]

---

1. None of Bridges, Ona and Onshore ever answered the Complaint or its predecessor versions. Bridges' failure to answer is accounted for by the automatic stay stemming from his bankruptcy proceedings. But Bridges' bankruptcy did not excuse Ona and Onshore from answering the Complaint, and their failure to do so resulted in entry of a default judgment against both on October 14, 1987. Hence only Nortman, Berrettini and COPCO remain as active defendants at this stage of the proceedings. Any generic reference to "defendants" in this opinion should thus be read as including only Nortman, Berrettini and COPCO.

2. It was a difficult decision whether to measure those paper submissions by the pound or by the inch (the other alternative of totaling up pages would have involved too laborious a counting and adding process). What has been tendered to tax both the resources and the patience of this Court's law clerk Hilary Krane and of this Court, in the meantime also disrupting the carefully-tuned timetable this Court allocates to contested motions in the sequence in which they become fully briefed, comprises:

    1. well over two inches of briefs on the merits: defendants' initial supporting memorandum as amended (cited "D. Mem.—"), plaintiffs' initial responsive memorandum (cited "P. Mem.—"), defendants' reply memorandum (cited "D.R. Mem.—"), plaintiffs' surreply memorandum (cited "P.S. Mem.—"), plaintiffs' motion to strike D.R. Mem. 3 n. 2 and defendants' brief response to *that* sideshow, coupled with defendants' brief response to P.S. Mem. (a sursurreply!);

    2. defendants' Amended Statement of Material Facts (cited "D. 12(1) ¶—"), proffered in accordance with this District Court's General Rule ("GR") 12(1), together with a nine-inch stack of 92 exhibits (cited "D. Ex.—") in support of that statement;

    3. plaintiffs' paragraph-by-paragraph response to defendants' factual statement (cited "P. 12(m) ¶—"), as called for by GR 12(m), coupled with (a) plaintiffs' motion to strike portions of defendants' GR 12(1) statement and (b) their own three-inch-thick set of exhibits;

    4. defendants' motion to strike several affidavits included with plaintiffs' GR 12(m) statement, followed by nearly two inches of briefing and exhibits on *that* subject: "D. Strk. Mem.," "P. Ans. Strk. Mem." and "D.R. Strk. Mem."

Fortunately Ms. Krane has been more than up to the Herculean task of sorting through the bulky materials, separating the wheat from the chaff (though given the vitriolic nature of the parties' attacks on each other, the most analogous metaphor might be the labor of Hercules given to cleansing the Augean stables) and preparing a cogent draft opinion for this Court's review and reworking. But as this Court is invariably careful to remark when paying this type of well-earned tribute to the work of one of its outstanding law clerks, the ultimate responsibility of course remains that of this Court: It reads every case cited in any of its opinions, and it reworks every sentence of its clerks' suggested

For the reasons stated in this memorandum opinion and order, defendants' motion is granted as to all counts except Count 4's Section 12(2) claim, as to which genuine issues of fact remain for resolution at trial.

### Facts [3]

This action arises out of an oil and gas drilling program gone south. Plaintiffs claim defendants fraudulently induced them to invest in a program that never had a chance at success. Defendants counter that circumstances beyond their control caused an otherwise viable and promising project to go awry. One thing is certain: Despite the overwhelming overlap between the facts as presented by the parties, each side views the other as wholly bankrupt and deceitful in presenting the story. For instance, plaintiffs open their responsive brief to defendants' summary judgment motion by stating that reading defendants' proffered documents is "like taking a trip 'Through The Looking Glass' " (P.Mem. 1). Not to be outdone on the level of literary allusion, defendants retort that "plaintiff's response brief would more aptly be titled 'The Grand Illusion', for in the end it amounts to no more than the product of the sheer imagination of its authors" (D.R. Mem. 3).

Maybe counsel found such flippant accusations provided them with some needed comic relief in the process of preparing their admittedly dry and voluminous submissions. Neither characterization, however, is accurate or helpful to this Court's task of evaluating the underlying facts. This opinion's factual statement will avoid inclusion of the unsubstantiated assertions and characterizations that riddle all the parties' submissions and will stick instead to the mundane, though more constructive, task of laying out the basic events that gave rise to this action.

In 1982 Jack Smith, President of Itex Energy Corporation of Houston ("Itex"), introduced Berrettini to Bridges. At that time Berrettini was Vice President of Finance at Itex, and it was in the context of conducting Itex business that Bridges and Berrettini met several times during the middle of 1982. In October or November of that year Berrettini raised the subject of pursuing an oil or gas deal venture in Texas, and Bridges recommended considering drilling in the shallow wells of Corsicana. After that initial discussion with Bridges, Berrettini discussed the possible venture with Nortman, with whom he had an ongoing business relationship. Nortman's interest in the venture led to a late 1982 meeting in Chicago among Berrettini, Nortman and Bridges.

At that Chicago meeting Bridges told Nortman and Berrettini that he was looking for a source of investment funds for oil ventures in shallow, low-risk wells in the Corsicana area. Bridges then represented that he had previous success drilling in that immediate area and such wells could be expected to produce between four and six barrels of oil a day. After that meeting Nortman spoke with Etta Cole, an attorney who had handled his business matters for a number of years, and through her with her husband Stan Cole ("Cole"), whom Nortman knew to have substantial experience in the business side of oil and gas investment. Nortman and Berrettini talked to Cole and presented him with the information available to them, including the location of the proposed project and numbers based on potential recoveries, oil prices and lease costs (all of which had been worked up by Berrettini). On the basis of that information Cole told Nortman and Berrettini that on paper it appeared to make sense and that he was willing to meet with them and Bridges.

---

draft opinions. Hence this just-completed end product, and any error that may have crept into it, are necessarily ascribable to this Court and not to Ms. Krane.

**3.** Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case plaintiffs (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)).

At that point (late 1982 or early 1983) Nortman and Berrettini began making inquiries into Bridges' background. Nortman called Cecil Holly of Production Research (a Texas oil concern), whom Bridges had offered as a reference. In response to his general questions aimed at "checking someone out," Nortman got a "fairly positive answer" (Nortman Dep. 105). Berrettini spoke to Everett Sharp, a geologist, who reported that he was aware of Bridges' work through business associations and believed Bridges to have a good reputation, and also confirmed that the Corsicana field was a relatively low-risk drilling site. Itex President Smith also reported that he believed Bridges' reputation to be good and represented that Bridges was especially knowledgeable in the area of shallow wells.

After making those inquiries Nortman and Berrettini travelled to Corsicana and met with Bridges. Bridges showed them the lease sites that would be available and some wells in the immediate area that he claimed to have drilled himself and that he also claimed were producing oil. Bridges further represented that the Wolf City formation, on which the already drilled wells were located, very likely extended into the proposed new drilling area. Nortman and Berrettini later generally reviewed the activity of that trip with Cole, and Bridges came to Chicago and himself made a presentation to Cole. That was followed by another trip to Texas from February 25 to 28, 1983—this time including both Etta and Stan Cole as well as Nortman and Berrettini. At the conclusion of that trip Cole reiterated his interest in the program and represented to Nortman and Berrettini that he was going to "check out" both Bridges and the proposed leases with his contacts in the oil industry.

Thereafter Cole reported to Nortman and Berrettini that his inquiries had yielded positive responses—specifically he confirmed that there was production on the wells contiguous to the proposed site, that shallow wells were less risky although less productive, and that he was satisfied with what he had learned of Bridges. On the basis of that information Cole was excited about the project and began to discuss the possible structure of the deal in terms of return to investors, number of wells to be drilled and the preparation of a prospectus for a limited partnership.

At that time (the very end of February or early March 1983) Nortman and Berrettini decided to move full steam ahead with the project. They took steps to implement the assignment of the lease to COPCO,[4] had a series of meetings with Cole, who was now the head of Interbanc Equity Corporation ("Interbanc"), and retained Michael Firsel ("Firsel") as an attorney for

---

**4.** Plaintiffs repeatedly assert that Nortman and Berrettini had acquired the lease well before that point (P. 12(m) ¶¶ 4, 10, 23, 28), but they are simply incorrect. True enough, P.Ex. B includes copies of two drafts payable to Pan Liberation Development Corporation, one listing Consolidated Energy Co., Inc. as drawer and drawee and the other listing COPCO as drawer and drawee. Because the drafts are identical except for that difference and because only the latter is executed, this Court assumes that the former was in error and that only the latter has any probative force. In any event the draft states:

> This draft is drawn to pay for Oil and Gas Lease Assignment dated February 17, 1983 and covering 304.59 acres in Navarro County, Texas (J. Wishart Lease).

Undoubtedly that language leads plaintiffs to believe that COPCO had acquired the lease in mid-February. But a closer reading reveals the document also states that payment on the draft is to be made:

> On approval of lease or mineral deed described hereon, and on approval of title to same by drawee not later that 30 days after arrival of this draft at collecting bank.

Hence the draft did not represent a contemporaneous payment of funds. Relatedly, despite the initial recitation that the assignment was dated February 17, 1983 no executed assignment of that date has been identified by the plaintiffs—the only executed assignment in the record is the one identified by the defendants and dated March 7, 1989. Thus the reasonable inference from the documents is that negotiations regarding the assignment had begun in February and the draft had been executed in contemplation of the ultimate approval of the lease and subsequent assignment, all of which occurred in March 1983. There is no indication that any money changed hands before March 1983, and there is no reason to believe that COPCO had "acquired" anything before March 7, 1983.

COPCO, the newly formed corporate general partner,[5] to help structure the deal and prepare the Private Placement Memorandum ("PPM") for the limited partnership offerings.

Firsel, Cole and Bridges shared responsibility for drafting the PPM for COPCO–1.[6] All of the geological data was prepared by Bridges and Matt Nelson ("Nelson") of Nelson Geological Consultants. Financial projections were prepared by Berrettini with the aid of a computer program and numbers provided by Bridges, supposedly based on actual production from wells drilled by Bridges in the immediate area. In addition the PPM included brief biographies of Nortman and Bridges, based on information that they respectively provided.[7]

COPCO–1 was offered for sale on April 1, 1983 with Interbanc as the sole broker of program units, taking 10% of the sale price of each unit as a commission. In addition to the already-described information, PPM–1 also explained that the lease was to be drilled on a "turnkey" basis by Ona. That arrangement involves the driller's agreement to complete a well—including roads, electricity tanks, flow lines, pump jacks, geological services and everything else necessary to "turn the key" to allow oil, gas and/or water to flow from the wells—at a fixed price. PPM–1 explicitly says that Ona built a substantial profit into the turnkey price, with the shareholders of the general partner COPCO expecting to share in that profit. Indeed, the actual turnkey contract, with a price of $60,062.19

per well, was set out in its entirety in the PPM.

Before the drilling in the COPCO–1 program had begun, COPCO drilled two wells (Baker 1 and 2) to comply with the lease requirement that drilling begin within a specified period of time after the acquisition of the lease. Bridges reported to both Nortman and Berrettini that drilling activity on those wells, which were in the COPCO–1 vicinity, showed initial production of oil.

By July 1, 1983 (the closing date for the offering of COPCO–1) 13.5 of the 30 available units of COPCO–1 had been subscribed. Early in August drilling on the COPCO–1 wells began. After completion of the first of several wells, Bridges told Nortman and Berrettini that things looked very positive and suggested they purchase the remaining units available in COPCO–1. Bridges offered to lend them the money to finance the purchase on the security of the Baker 1 and 2 wells, with the revenues from those wells to repay the loan. COPCO then purchased the remaining units and, on the advice of Firsel and another attorney Mark Samotny ("Samotny"), offered the limited partners the opportunity to acquire those units from COPCO before purchasing them themselves. That offer resulted in the sale of several more units to limited partners, leaving ten units available for Nortman, Berrettini and Bridges. Each of them bought 3⅓ units, with purchase money borrowed from Ona on the terms outlined above.[8]

---

5. COPCO's Articles of Incorporation were signed by Nortman and Berrettini on February 22, 1983, although the official Certificate of Incorporation did not issue from the Secretary of State's office until April 8, 1983.

6. In its entirety the COPCO venture comprised four programs: COPCO Drilling Program 1983–1 ("COPCO–1"), COPCO Developmental Drilling Program 1983–2 ("COPCO–2"), COPCO Developmental Drilling Program 1983–3 ("COPCO–3") and COPCO Developmental Drilling Program # 4 ("COPCO–4"). COPCO–1's PPM provided the blueprint for the remaining PPMs used in the later COPCO programs. This opinion will sometimes refer to a PPM by the same number as the drilling program to which it related (thus "PPM–1" stands for the COPCO–1 PPM).

7. Berrettini did not officially become a COPCO shareholder and principal until October 1983, after the issuance of PPM–1.

8. P. 12(m) ¶ 87 attempts to cast a shadow over this transaction by raising an eyebrow at the fact that COPCO did not pay for the units in July or August, when the sale originally took place, but rather deposited the checks only in late September. But that is hardly suspect: Until late September (when the offer of remaining shares to the limited partners ended) it remained unclear to what extent limited partners would buy up the units, so the amount owing from each of Nortman, Berrettini and Bridges remained unclear. Once that was known the payment for the remaining shares was made into the COPCO–1 account, with the partnership units issuing only *after* the payment had been

As the drilling on COPCO–1 wells continued, each of Nortman, Berrettini, Cole and Firsel received positive reports from Bridges on the progress being made. In the beginning of October 1983 Nortman and Berrettini made a trip to Texas to observe the progress. Bridges took them on a tour of the property, showed them what he represented to be oil shows and reported on the favorable results of geological logs that had been conducted by him as well as by independent parties. On the basis of the information provided by Bridges on that trip, Nortman prepared an October 3, 1983 report to investors.

On December 7, 1983 an additional 10% capital contribution call for COPCO–1 was made by a letter reporting that of the 10 wells drilled, five had been completed and three more were anticipated to be completed on or before December 15, 1983. Again the information in that letter had been provided to Nortman and Berrettini by Bridges.

In early December Nortman and Berrettini travelled once again to the COPCO fields to gather information for another investors report. Based on limited personal observations and on reports and projections provided by Bridges and Nelson, Nortman and Berrettini sent a December 13, 1983 report to investors notifying them that seven wells had been completed (six of which had been equipped with pumping units). That report also said COPCO was hopeful that nine of the ten wells would be completed and pumping before the end of that week, while the tenth well would not be put on stream because it was a gas well that was showing "rather prolific tendencies." That last bit of information as to the gas well had been independently confirmed in a test conducted by Well Test,

Inc. and overseen by East Texas Consultants ("ETC"). While ETC cautioned that further testing was required, it did report that "the well does seem to be prolific" (D. Ex. 11).

Meanwhile the COPCO–2 PPM had been issued on October 25, 1983. Central to the drafting of that PPM (as well as that for COPCO–3) was the determination as to whether to characterize the programs as "developmental" or "exploratory." With the aid of Bridges-provided information, Cole, Firsel and Samotny determined that use of the term "developmental" as defined in the PPM was appropriate. That term was ultimately employed with Nortman's and Berrettini's approval. Nonetheless the PPM–2 contained much cautionary language warning investors that it was still possible that none of the wells would produce commercial quantities of oil.

PPM–3, issued on November 17, 1983, contained the same representations and caveats as did PPM–2. Again Cole and Interbanc were given exclusive selling rights for both COPCO–2 and COPCO–3.

In the beginning of 1984 Ona hired several new technical employees to work on the COPCO programs: Edgar D'Abre ("D'Abre") joined Nelson as an additional geologist; Jeffrey Arnold ("Arnold"), who had an educational background in chemistry and accounting and had experience in drilling and engineering, joined Ona as a field operations manager; Ben Edwards ("Edwards"), who had degrees in chemistry and financial management as well as a background in drilling and petroleum engineering (including having completed approximately 100 wells in the Corsicana shallow fields), joined Ona as a petroleum engineer.[9] Those new hires, as well as the

received in the COPCO–1 account. Defendants also attempt to asperse the transaction by noting that COPCO–1 had paid Ona for services before Ona loaned the money to Nortman and Berrettini, thus implying that the purchase had been made with ill-gotten investor funds. As discussed more fully later in the text, those facts do not create a reasonable inference of wrongdoing:

1. There is no showing that the funds loaned were not Ona's from another source.

2. There is no evidence that Ona did not complete the work for which the payment was made.

3. There is no showing that the Baker wells were not meaningful collateral to secure an otherwise unexceptionable loan.

9. Again plaintiffs attempt to create the appearance of dishonesty on the part of defendants by asserting those individuals were in fact hired by COPCO and not by Ona (P. 12(m) ¶¶ 120 and 122). Whatever significance that might have if

information gathered from Nortman and Berrettini's January trip to Texas, were reported to the investors in two letters dated February 1, 1984—one addressed to COPCO-1 investors and the other to COPCO-3 investors. Enclosed with the correspondence were the investors' K-1 income tax schedules for 1983. Also included in the COPCO-1 letter was a completion report, with a description of the status of each of the wells. Each of those letters also referred to a geological report that was being prepared by D'Abre and was ultimately included in the COPCO-4 PPM.

When Arnold first began working on the COPCO programs, he went to the fields two to three times each week. That number gradually increased to the point where he virtually lived at the fields. Thus when in February 1984 COPCO requested periodic reports from the fields on the status of the three ongoing programs, it was Arnold who took the responsibility of preparing handwritten summaries based on his personal observations and reports from D'Abre and Bridges. Reports were also received by Nortman and other COPCO personnel in Chicago via telephone from Bridges or Arnold, and whenever possible back-up reports would be attached to the typed memorials of telephonic reports from the field. COPCO received such reports on a weekly or bi-weekly basis from late February or early March through May 1984. All those reports were forwarded to Cole at Interbanc.

According to those reports, wells in all three programs showed signs of oil during drilling, although further work was required to determine if commercially producible quantities were available. On April 30, 1984 Arnold advised COPCO that an oil

pick up of 39 barrels from COPCO-1 was made on April 23—advice matched by a crude oil manifest from Scurlock Oil Company reflecting 38 barrels on that date. COPCO now acknowledges the Scurlock pick-up was of frac oil (oil injected into and then pumped back out of a well to attempt to stimulate production) rather than regular oil, but at the time both the reports from the field and the face of the Scurlock manifest clearly indicated that regular oil had been picked up.

In spring 1984 the COPCO-1 wells became trouble-ridden. Some began producing excessive amounts of water, so that injection wells had to be drilled to get rid of the water. Some began to develop gas lock and to produce a mixture of oil, gas and water. As a result the wells were shut in until tests could be made to determine their gas potential. Although negotiations were commenced with Cherokee Gathering Company to conduct gas tests on those wells, no such tests were in fact done.

COPCO-4 PPM was issued on March 15, 1984. Bridges individually was a general partner in the COPCO-4 program. Like COPCO-2 and COPCO-3, the COPCO-4 program was labelled "developmental"—but the PPM set out the various stages of completion of the 28 wells that had been drilled in connection with the other three programs and warned that although oil appeared to be present, no assurances could be given that the wells would produce in commercial quantities or that any well would produce on a consistent ongoing basis. PPM-4 also said that to the extent wells were drilled in areas where no logs were available from past drilling by the partner, the current proposed drilling should be deemed exploratory. Not until

it were true (and any such significance is at best an uncertain matter), it is plainly untrue. Arnold Dep. 323-25 confirmed that all those employees were hired and paid for by Ona. In the face of that sworn testimony, the mere fact that the February 1, 1984 letter to investors said that "we" hired the people does not reasonably call for a different inference. Nor does the fact that D'Abre's resume lists his most current experience as "Petroleum Geologist, COPCO, Texas" change that result. There is no dispute that as an Ona employee D'Abre worked exclusively on

the COPCO fields—a fact that makes his resume listing perfectly reasonable as a shorthand method of identifying his activities with specificity. Plaintiffs further argue that if the individuals were in fact Ona and not COPCO employees, the imprecision in the February 1 letter raises serious credibility questions for defendants (P. Mem. 127). That is wholly unpersuasive: Surely careless drafting is not the kind of calculated misstatement that raises blanket credibility problems.

December 31, 1984 were the minimum number of units in COPCO–4 sold, and of the ten plaintiff investors in COPCO–4 only two had not invested in any of the earlier COPCO programs.

In the summer of 1984 independent petroleum engineer Joseph Galoostian ("Galoostian") was hired to perform an evaluation of the COPCO fields. Galoostian's July 9, 1984 report provided a positive analysis of the COPCO fields and confirmed much of the data previously received from Ona. Galoostian then attended a July 17, 1984 investors' meeting and presented his report to the investors present. At that meeting D'Abre represented that only five more working days were needed to complete COPCO–2 and COPCO–3, although actual completion was not ultimately achieved until the end of January 1985.

It was also in the summer of 1984 that relations between Bridges–Arnold and Nortman–Berrettini became strained. That problem first manifested itself in June, when Bridges and Arnold travelled to Chicago to meet with Firsel about their complaint that Ona was having difficulty getting funds from COPCO. After that meeting Bridges attempted to withdraw the entire amount in an Ona Chicago account (approximately $230,000). However, at the request of the bank he withdrew only $30,000, the amount he needed at that time. Later that same week Bridges, Nortman and Berrettini met to discuss the financial situation. Bridges took the position that the money in the account was profit under the drilling contract, so that the three of them should therefore divide it among themselves as spelled out in the PPMs. Nortman and Berrettini refused to follow that path and instead obtained Bridges' agreement to transfer it to their control for future use in the fields as needed. It was

their position that all sums owing to Ona pursuant to the turnkey contracts for COPCO–1, –2 and –3 had been disbursed, so that they should maintain control of the excess funds.

At that stage Arnold's understanding of the financial situation proves important, because Bridges began using Arnold as his collection arm in his disagreements with Nortman and Berrettini. Despite the purported understanding reached in June as to the funds in the Chicago Ona account, Bridges told Arnold that COPCO owed Ona money and that he should try to retrieve it. Arnold was aware that Ona was bouncing checks and did not have enough money, and he followed Bridges' orders to try to get the money. To that end Arnold travelled to Chicago in October to meet with Cole, who had agreed to act as intermediary at Bridges' request. At that meeting Arnold presented Cole with an invoice of charges owing from COPCO to Ona that Arnold had prepared. Cole was shocked at the size of the invoice presented by Arnold and agreed to talk to Nortman and Berrettini.

Meanwhile [10] Firsel and Berrettini made a trip to Corsicana during which they visited the fields. In the course of that visit they observed, and D'Abre represented, that COPCO–1 was drilled and completed and that COPCO–2 and –3 were drilled and in the final stages of completion. Firsel saw oil in collection tanks and several wells that were pumping a mixture of oil and water. Firsel also visited the Ona offices, where Bridges and Arnold reviewed all of the COPCO and COPCO–1, –2 and –3 records in Firsel's presence. Despite repeated requests, Bridges refused to make Ona's books available at that time.

In the second week of September 1984 Cole, Bridges, Nortman and Berrettini met

**10.** Defendants maintain that the meeting between Arnold and Cole took place in August 1984 and that the activities of COPCO explained in this text paragraph were a result of the concerns passed along through Cole. Plaintiffs, however, offer the testimony of Etta Cole for the proposition that the Arnold–Cole meeting did not occur until October 1984. This Court must accept plaintiffs' version, from which it appears that the COPCO investigations outlined here took place before the Arnold–Cole meeting, therefore leaving a question as to what the impetus for that activity may have been. Of course there is no doubt or dispute that COPCO was aware of the ongoing discord over finances well before Arnold's trip to Chicago, which could account for defendants' interest in investigating and squaring the situation with Bridges.

and established a schedule for the completion of the wells. Bridges agreed to be prepared to follow the schedule within a week or so, and Berrettini was to travel to Texas to oversee payment of the work being done. Pursuant to that agreement Berrettini travelled to Texas in the last week of September, only to find that the work scheduled to be completed had not been set up. With D'Abre's help Berrettini paid what outstanding bills he could and deposited additional funds in COPCO's Texas bank account. Those additional funds originated from a segregated account in Chicago, which had been established when Bridges transferred $102,000 to COPCO at the end of December 1983. Bridges represented those funds to be an advance on profits.

Berrettini reported his field observations to Interbanc employee Curtis Bergquist ("Bergquist"), who then prepared a status report to COPCO–2 and –3 investors. Berrettini returned to Texas in the second week of October to discover that rain had delayed the scheduled completion and that the money previously deposited into the Texas account was depleted and had not been used as intended. After further meetings with Arnold a revised estimate of costs for completing COPCO–2 and –3 was prepared and, at Interbanc's insistence, an escrow agreement for further payment of funds on those programs was entered into on November 15, 1984.[11] Under the agreement Ona executed releases and waivers of liens to COPCO and COPCO–1, –2 and –3, and Nortman and Berrettini deposited $115,000 into the escrow.[12] In addition, the agreement required Ona, in order to have funds released, to present sworn statements as to the work to be done and its cost, after which Ona was to obtain a paid receipt and a lien waiver from the party doing the work.

During late October and early November 1984 Arnold reported to Nortman and Berrettini (1) that he believed Ona had located a suitable buyer for the gas found in the COPCO–1 program to provide for a capital return to the investors and (2) that Ona was in the final stages of completing COPCO–2 and –3, although bad weather was hampering progress. On December 17, 1984 Bridges, Berrettini, Nortman and Cole met to discuss the future of the COPCO programs and agreed that all funds for COPCO–4 would be put into escrow in Texas and that the program would not move forward until D'Abre and Interbanc verified that COPCO–2 and –3 had been completed.[13] They also discussed the continuation of Bridges' efforts to obtain a gas contract for COPCO–1.

January 1985 finally witnessed the completion of the COPCO–1, –2 and –3 programs. On January 19 Bridges and Arnold informed Nortman and Berrettini that all ten wells in both the COPCO–2 and –3 programs were complete and pumping fluid into the tank batteries. On January 29 D'Abre reported that COPCO–1, –2 and –3 were all completed to tanks, with all systems including electric and water disposal having been completed, thus completing Ona's obligations under the turnkey contract. Cole and Bergquist personally reported to Firsel that they had inspected the fields and that the programs were complete in total accordance with the requirements of the respective PPMs. Nortman and Ber-

---

11. D. Ex. 40 is a copy of the escrow agreement.

12. One of the hot disputes between the parties is over the source of those funds (D. 12(1) ¶ 182; P. 12(m) ¶ 182): Nortman and Berrettini claim $68,000 of the escrow money was from their personal funds, with the remainder coming from COPCO and *not* the limited partnerships. Plaintiffs assert that all of the supposedly "personal funds" and at least part of the COPCO funds were actually limited partnership funds that had been sent from Texas to Chicago as an advance on profits. Neither side offers any hard evidence on this point. Indeed, a close look shows the two explanations are not mutu-

ally exclusive: It has nowhere been established that any advance on profits actually constituted investor funds. But in light of the conclusions later reached in this opinion, the issue proves truly non-material (that is, non-outcome-determinative).

13. Later Nortman and Berrettini and Cole chose February 28, 1985 as the date on which investors' funds for COPCO–4 (including Interbanc's commission) would be returned in the event COPCO–2 and –3 were not completed (D. Ex. 43).

rettini also went to Texas and inspected the fields and concluded that the terms of the turnkey contract had been met.

Based on his personal observations and experience, Arnold believed that COPCO-1, -2 and -3 were pumping fluid formation water, and he observed that wells in all three programs had oil shows in the form of rainbows indicating the presence of oil. Because of the oil shows and the initial production of oil and water, the wells had been completed as oil wells. In early February COPCO informed the investors in COPCO-2 and -3 that the programs were complete and, in the case of COPCO-3, made a 10% capital contribution call as provided for in PPM-3.

With the initial three programs nearing completion, D'Abre, Arnold, Berrettini, Nortman, Bridges and Cole had met on January 17, 1985 to discuss plans for COP-CO-4. D'Abre presented a geology report on COPCO-4—basically an overview of geological data from the field producing next to the COPCO-4 lease and from the 31 wells in the other three COPCO programs. Bridges, Berrettini and Cole reached an agreement to proceed with COPCO-4 by establishing another escrow account, the details to be worked out by Firsel and Texas attorney John Theis ("Theis"), and by agreeing that Nortman, Berrettini and Bridges would share equally in the anticipated profits from the program. Final agreement as to those terms was memorialized in a March 4, 1985 letter agreement, the escrow agreement was entered into the following day and COPCO forwarded the required funds to Theis.

Another $20,000 was also provided to Theis as escrowee, to be disbursed for the cost of operating COPCO-2 and -3 through March 31, 1985.[14] Bridges used Ona personnel, equipment and resources to operate the COPCO leases as a subcontractor for COPCO, the named operator. On March 5 D'Abre prepared a status report for Nortman and Berrettini on COPCO-1, -2 and -3 in which he verified that all three programs were running on operating capital forwarded by COPCO. D'Abre also reported substantial gassing up in all three programs. All of COPCO-1 had been capped and shut in, and several wells in COPCO-2 and -3 had also gassed up and been shut in. Ten other wells had shown initial gas production before seizing up due to technical problems. D'Abre explained that those wells would be reworked by the operating personnel and pumped until they established a production pattern, with the established gas wells remaining shut in until a gathering system could be constructed. D'Abre concluded that report by stating, "Congratulations gentlemen! It appears you have a commercial gas field."

On March 6 COPCO sent a letter to the limited partners in the first three programs, advising them of the status of the programs at that date to the extent known by COPCO. Its letter was based on representations from Bridges, D'Abre, Arnold and Cole. That did not of course include all the information transmitted by D'Abre in his March 5 letter to COPCO, which on the face of it would not have been received by COPCO until after the March 6 letter was mailed.[15] That letter did inform the

---

**14.** Where those funds came from remains a mystery. Plaintiffs assert that the mere existence of those funds in Theis' control is evidence of commingling of the funds of the various programs. That conclusion presupposes that the $20,000 derived from COPCO-4 investors' funds—a possibility for which absolutely no proof has been offered. Although plaintiffs as non-movants do get the benefit of all reasonable inferences, they cannot merely assert that those funds were COPCO-4 investors' money without pointing to any support for that accusation. Not even the lenient eye of a court viewing the evidence in the summary judgment context is free to credit such rank speculation as a reasonable inference.

**15.** Plaintiffs try to impute wrongdoing and machinations to Nortman and Berrettini based on their failure to include the information in the March 6 status report. But common sense dictates that the contents of a letter signed on March 5 in Texas would not be known to its intended recipients in Chicago in advance of the signing of a letter the next day, March 6. Even an express mailing could not have made the trip in that limited space of time, and there is no evidence to suggest an instantaneous transmittal via fax. In any event, that timing does not call for a reasonable inference in plaintiffs' favor in the absence of any hard evidence of an omission by Nortman and Berrettini.

investors that the nine months of gas contract negotiations were showing signs of paying off and that COPCO in fact had a contract proposal in hand.

By late March a gas contract was finally executed between COPCO and Tangram Transmission Corporation ("Tangram"). As a condition precedent to Tangram's incurring any expense for setting up a delivery system, COPCO obliged itself to perform and report the results of a deliverability gas test on the fields. To that end COPCO engaged Milton M. Cook Company to perform the testing. Later in 1985 Tangram merged with Techline Industries, Inc. ("Techline") and the COPCO contract was assigned to Techline. On June 4, 1985 COPCO and Techline executed a contract. By letter dated June 21, 1985 COPCO informed the COPCO–1, –2 and –3 investors of the gas contract and the need for testing. At that time it also reminded the investors that COPCO was under no obligation to advance funds for the testing and said that because COPCO had already expended substantial amounts above the price of the turnkey contract it was not in a position to pay for the testing. Accordingly the letter requested pro rata contributions from the investors to fund the tests.

Approximately two weeks after the call was made to the investors, Cole informed Nortman that the call had been unnecessary because Bridges had informed Cole that Bridges would pay for the test personally. Bridges later denied that statement to Nortman, saying instead that he had merely obtained credit from the company performing the test. In the meantime Nortman and Berrettini determined that based on Cole's report the investors' funds that had been forwarded for the test should be returned. At an August 28 limited partnership meeting in Northbrook (with Bridges, Berrettini, Nortman, Arnold, Bergquist and a number of investors present), Bridges and Arnold reported that Don Owens of Techlines was to supervise the testing, which would be completed within the succeeding two or three weeks.

Drilling on COPCO–4 began in the spring of 1985 and proceeded quite smoothly. COPCO–4 operated on budget, and funds were made available through Theis as needed. By June 1 D'Abre reported that the majority of the COPCO–4 wells were drilled and pumping although no tank battery had been built, no flow lines had been installed and no electrical systems had been installed. At the end of that month Berrettini and Nortman made an inspection trip to the COPCO–4 field. On that occasion Bridges and D'Abre represented that five wells had been completed and two had been cased and cemented and that there was initial oil production from the five completed wells, verified by the logs. Nortman, Berrettini and Bergquist all confirmed by physical inspection the presence of oil in the temporary tank batteries of COPCO–4. D'Abre and Bridges both recommended completion of the remaining two wells, said that there was an excellent probability that COPCO–4 would be a good oil program and added that there was no evidence of gas production at that time. COPCO then sent a letter summarizing that information to the COPCO–4 investors and made the call for the 15% capital contribution provided for in PPM–4.

In mid-August 1985 Nortman and Berrettini were advised that the COPCO–4 15% call had, with the acquiescence of Cole and Bergquist, been redirected to Bridges. In fact Bridges had sent letters to the COPCO–4 investors directing them to mail their contributions directly to Texas in self-addressed envelopes he had enclosed. Without the knowledge of Nortman and Berrettini, Bridges began taking a lot of unilateral actions at that time. First of all he was communicating directly with Bergquist, who in turn dealt with investors about the 15% capital call without any notification to Nortman and Berrettini. Bergquist was also conducting negotiations with Techlines for gas testing, informing only Bridges of the substance of those negotiations. Furthermore, in September 1985 Nortman and Berrettini learned that Bridges had granted BGB Investments a 1% overriding interest in the acreage where COPCO–4 had been

drilled.[16] Bridges also gave Arnold a .5% overriding interest in COPCO–4 and also explained to Arnold that he had renegotiated the Bartlett lease and in so doing had granted overrides to various people.

Beginning in April 1985 and continuing through mid–1986, Nortman, Berrettini, Firsel and even Bridges' Texas attorney Gregory Sweeney ("Sweeney") made repeated unsuccessful requests to Bridges and Arnold to provide COPCO with an allocation of equipment between the programs, an inventory of equipment and copies of all logs for the programs. On October 18, 1985 Bridges resigned as chief executive of COPCO and advised Nortman and Berrettini that his stock should be put in the name of the limited partners' investment group and sent to Donohoe. On November 4, 1985 Bridges resigned from the Board of Directors of COPCO, stating he would no longer act as a representative of COPCO except to execute his responsibilities as individual general partner of COPCO–4.

Throughout the remainder of 1985 and into 1986, Nortman and Berrettini attempted to find an operator for the COPCO fields to replace Bridges. To that end they communicated with Bob Stovall ("Stovall") of Southern Petroleum Company, Everett Sharp and Galoostian, ultimately hiring Stovall for the job. Throughout the same period Nortman and Berrettini continued to try to obtain from Bridges and Arnold the allocations and inventories of equipment and logs and other geological data to provide to potential new operators. Again their efforts were rebuffed.

In November and December 1985 COPCO again issued a call for voluntary contributions from the limited investors in all four programs. For the first three programs the funds were to conduct further gas tests to permit execution of the pending gas contracts (as already stated, all funds collected earlier for that purpose had been returned to investors). As for COPCO–4, the sought-after contributions were to provide funds for an operator for that field—only a limited number of investors contributed, because many took the position that COPCO had the responsibility for advancing funds for such work. On that score, despite repeated requests from COPCO Bridges did not release the approximately $42,000 he had received in connection with the 15% capital contribution call in COPCO–4.

On March 11, 1986 a meeting was held in Chicago with Stovall and Owen of Techlines, to discuss once again the gas contract for COPCO–1, –2 and –3. Present at that meeting were Nortman, Berrettini, Bergquist and investors Clarence Sopko and Arnie Jensen. This time it was agreed that Stovall would perform the deliverability tests, which had still not been completed, and that he would complete an inventory of all equipment of the four COPCO programs (never prepared by Bridges and Arnold). Stovall agreed to do that work at a reduced price, which was to be paid out of funds advanced by the contributing limited partners and COPCO. Following that meeting a number of documents were provided to Stovall to assist him with his work. Among those were checks for services to be performed, all well tests in COPCO files, copies of logs and other items related to the fields.

On April 22, 1986 Bridges wrote to Nortman and told him that Bridges had acquired the lease to COPCO–4 and was resigning as the individual general partner of COPCO–4. Bridges added that he was going to give the wells back to the investors and have Stovall operate the field. Stovall's April 24, 1986 letter confirmed that Bridges had in fact obtained the leases but stated that Bridges had instructed Stovall not to perform any work on COPCO–4. Unable to do anything else as to COPCO–4 under those circumstances, COPCO (on behalf of itself and the limited partnerships) took legal action against Bridges, Ona and Theis.

On April 29, 1986 Stovall informed Nortman that COPCO–1, –2 and –3 could be

16. BGB Investments, a plaintiff in this lawsuit, is an entity in which Bergquist and Cole were principals.

made into a paying endeavor, although he could not then state how much it would cost to make them operational. By July 1986 COPCO had learned that it would take approximately $80,000 to transform the programs into productive gas fields. Because insufficient funds were available to COPCO to make that transformation COPCO ceased operating the wells in COPCO-1, –2 and –3. At that point all operations in all the COPCO programs ceased, and soon thereafter this action was filed.

### Alleged Fraudulent Scheme

Complaint ¶¶ 12–17 set out the alleged fraudulent scheme that underlies all the charged violations except for the securities registrations and breach of fiduciary duty claims, which will be dealt with separately. Direct quotation from the Complaint proves simplest in conveying the essence of plaintiffs' gripes:

12. Although the formal structure of the Limited Partnerships was modified from time to time, the fraudulent scheme applied to all of the Limited Partnerships as a whole and involved in a common purpose, as well as common misrepresentations and omissions concealed from Plaintiffs. The basic elements of this fraudulent scheme were as follows:

(a) there was no reasonable possibility of economic gain;

(b) the stated likelihood that drilling efforts would be successful in Copco 1 was represented solely to entice investors into that program, following which Copco 2, 3, and 4 could then be organized as purported more conservative "developmental" programs; and

(c) bogus completion reports and successful results would be reported for Copco 1 to induce investors to purchase units in Copco 2, 3 and 4.

\* \* \* \* \* \*

14. In order to induce Plaintiffs to invest in the Limited Partnerships, Defendants in the Memoranda falsely represented that:

(a) As to Copco 1:

(1) the turnkey drilling price was competitive;

(2) a likelihood of successful drilling existed;

(3) the funds raised were sufficient to drill and complete the proposed wells to the level of commercial production; and

(4) a fair consideration would be made by Defendants of whether or not the wells should be completed.

(b) As to Copco 2, 3 and 4 (in addition to subparagraph (a) above):

(1) the wells would be drilled on "developmental" acreage;

(2) previous wells drilled on the same acreage were completed and producing;

(3) there had been successful prior drilling activities of Copco, the General Partner; and

(4) there were favorable reports of past drilling activities in the general area, although such was not relevant to the possible success of the Limited Partnerships.

(c) As to Copco 4 (in addition to subparagraphs (a) and (b) above):

(1) several wells were pumping oil into tanks;

(2) previous wells were in various stages of completion, all of which was also set forth in various reports to Plaintiffs, as described in ¶ 16.

15. The representations in ¶ 14 were false and misleading in that the Memoranda failed to disclose that:

(a) The turnkey contract for drilling costs, from a conceptual standpoint, was attractive, but the turnkey price set was grossly in excess of the actual drilling costs for work performed;

(b) the Defendants knew or had reason to believe that the likelihood of successful drilling was extremely remote;

(c) the Defendants knew or had reason to believe that all the wells would be drilled, as if completed, to ensure that Defendants' profits would be enhanced;

(d) the term "developmental" could not be fairly or accurately used in con-

nection with the program, as that term is commonly used in the oil industry to indicate a relatively low risk prospect closely adjacent to commercially producing wells;

(e) Copco 1 was a failure at the time of offerings for Copco 2, 3 and 4;

(f) the geological reports and evaluations contained in the Memoranda were of no use whatsoever in supporting the purported economic viability of the programs; and

(g) the turnkey price, although grossly excessive in light of the actual work performed, would, in all likelihood, not be sufficient for the purpose of making the wells commercially productive.

16. During the period of time in which units in the Limited Partnerships were being sold, Defendants compounded the above misrepresentations and furthered their fraudulent scheme by:

(a) issuing favorable reports—which were not based on the true facts—dated October 3, 1983; December 7, 1983; December 13, 1983; and February 1, 1984. Such reports were false and misleading in that it was represented that:

(1) production was in excess of projections (October 3, 1983; February 1, 1984);

(2) revenue would be generated in the near future (October 3, 1983);

(3) oil production would commence on December 15, 1983 (December 7, 1983; December 13, 1983); and

(4) additional favorable geological data had been obtained (February 1, 1984);

(b) making bogus cash distributions (in or about April 1984) to investors to entice them to believe in the probable success of the investment and the programs;

(c) preparing geological reports which were without merit insofar as the economic·potential of the proposed wells; and

(d) not disclosing that the field on which the wells were drilled was substantially depleted.

Despite what would appear—at least in surface terms—to be the overwhelmingly factual nature of this dispute, defendants have moved for summary judgment on all of the fraud-based claims. They assert that (1) there is no expert testimony or evidence to support the alleged technical deficiencies in the programs, (2) based on the totality of the facts it is wholly implausible that COPCO, Nortman and Berrettini engaged in the charged scheme to defraud, (3) every specific allegation of a knowing misrepresentation or omission on the part of COPCO, Nortman and Berrettini has no basis in fact and (4) each of the counts must fail due to insufficient basis in law or due to the lack of any genuine issue of material fact going to an essential element of the cause of action claimed.

### Alleged Breach of Fiduciary Duty

Complaint Count Six alleges that defendants owed plaintiffs fiduciary obligations by virtue of the facts that defendants were sponsors and general partners in the venture, had control over disposition of partnership funds and were relied upon and trusted by plaintiffs. Plaintiffs assert those fiduciary obligations included duties to act in good faith, to exercise a high degree of trust and to act with a high degree of care as to plaintiffs' funds in their control. In addition to the assertedly fraudulent promotion of the investment (already detailed), plaintiffs contend that defendants intentionally breached their fiduciary obligations by (this time quoting directly from Complaint ¶ 37):

(a) failing to transmit to Plaintiffs timely or accurate form K–1's;

(b) failing to provide to Plaintiffs audited financial statements;

(c) commingling Plaintiffs' funds with other funds in an improper manner;

(d) misappropriating Plaintiffs' funds and using them for personal, rather than partnership, purposes;

(e) using equipment purchased with the funds received from Plaintiffs in one

partnership for the operation of other partnerships;

(f) making bogus cash distributions to the investors in order to deceive them into believing that the investments were in the process of becoming commercially viable;

(g) making a call for supplemental funds upon completion of wells when in fact those wells had not been completed;

(h) mismanaging and wasting of partnership assets by purchasing equipment not suited for the purposes of the Limited Partnerships;

(i) defaulting on subcontracts and suppliers' contracts, thereby incurring unnecessary lawsuits and delays in work;

(j) using partnership property for personal purposes, all in derogation of the operating agreements between Plaintiffs and Defendants; and

(k) abandoning or diverting to other uses equipment belonging to the partnership.

In moving for summary judgment on that count, defendants argue that (1) plaintiffs lack standing to pursue that claim individually; (2) only COPCO as general partner owed a fiduciary duty to the limited partners, and the limited partners cannot pierce the corporate veil to place liability on Nortman and Berrettini individually; (3) each specific allegation of breach has no basis in fact; and (4) no alleged breach, even assuming one occurred, was the proximate cause of any loss to plaintiffs.

### Registration

Complaint Count Three alleges that defendants sold unregistered securities to plaintiffs in violation of Securities Act of 1933 ("1933 Act") § 5 (15 U.S.C. § 77e) and Illinois securities laws. Defendants admit they sold unregistered securities, but they move for summary judgment on the ground that no registration was required because the offering fell into the specific exemptions of the 1933 Act and the Illinois securities laws.

### Preliminary Evidentiary Matters

Before this Court addresses the substantive legal and factual arguments put forth by the parties, this opinion must first touch on several preliminary evidentiary issues. In fact those issues have already been subsumed in the just-completed statements of facts, but it is useful to make explicit the reasoning underlying the determinations made there.

### 1. Hearsay

Plaintiffs' GR 12(m) response repeatedly lodges hearsay objections to defendants' GR 12(1) statements that refer to information communicated to defendants by third parties. Wherever defendants state that at a certain meeting or in a certain conversation Bridges (or D'Abre or Arnold or anyone else) told them something, plaintiffs consistently ask that those statements be barred as inadmissible hearsay. As implied by this opinion's inclusion of several of those statements in the preceding factual summary, such objections are without merit.

■ Fed.R.Evid. 801(c) provides the relevant definition:

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

That of course does not call for excluding all non-testimonial statements from evidence—only such statements as are "offered ... to prove the truth of the matter asserted." [17] Where as here out-of-court statements are offered only as they bear upon the state of mind of the listener, the declarant's veracity is irrelevant, the rationale for excluding hearsay in the first place becomes inapposite and the evidence is admissible (*United States v. Norwood*, 798 F.2d 1094, 1097 & n. 4 (7th Cir.1986)). It follows then that the non-testimonial statements included in the factual summary can and will be used only to show what impact

---

**17.** Of course even statements in the latter category are still admissible if they are either (1) non-hearsay (see Fed.R.Evid. 801(d)) or (2) within the numerous exceptions itemized in Fed.R.Evid. 803 and 804.

if any they could reasonably have had on the listener, and not for the truth of the statements themselves.

### 2. *Illinois Dead–Man's Act*

■ Plaintiffs' second major evidentiary objection presents a slightly more complicated issue. Plaintiffs contend that the Illinois Dead–Man's Act, read in conjunction with Fed.R.Evid. 601, should bar this Court from considering any testimony as to the statements or actions of Cole (who is now deceased). But this Court has determined that application of that statute would be inappropriate in light of the predominance of federal questions in this litigation.

Illinois' Dead–Man's Act [18] blocks the admission into evidence of alleged statements and actions of since-deceased individuals. Fed.R.Evid. 601 contains this mandate:

> [I]n civil actions ... with respect to an element of a claim or defense as to which State law provides the rule of decision, the competency of a witness shall be determined in accordance with State law.

Both the literal terms of that directive and cases such as *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1051 (7th Cir.1977) make it clear that where a federal claim is at issue the Dead–Man's Act is inapplicable. This case poses a different question: whether and to what extent that Act should apply where a mixture of state and federal claims is presented in a federal forum.

Plaintiffs argue that failure to apply the Dead–Man's Act here would result in unfair prejudice to them—they say the overlapping elements of the state and federal claims would make it impossible for a limiting instruction to provide them with adequate assurance that the jury would not improperly consider Cole's actions and statements in evaluating their state law claims. It may well be true that a limiting instruction in this setting would pose the potential for jury confusion—there may be some element of fiction in the notion that the jury, in the privacy of the jury room, can or will be meticulous in ignoring such evidence of which the jurors are aware. But to the extent that plaintiffs' contention has any force, the potential for prejudice really cuts in the other direction. Of plaintiffs' nine claims, six present federal questions and only three raise pendent state claims (common law fraud, breach of fiduciary duties and violation of the state blue-sky laws by issuance of unregistered securities). And among those three claims, the testimony about Cole relates only to the repetitive common law fraud claim (for it bears on the presence or absence of fraudulent intent). But on the federal claims the same issue of fraudulent intent, to which the Cole-related testimony relates, proves central to both the SEC Rule 10b–5 claim and the RICO counts. That being the case, defendants would suffer far more prejudice from the total exclusion of evidence that goes directly to the heart of several of the federal claims brought against them.

Moreover, admissibility of the challenged testimony appears to further the policies of the Federal Rules of Evidence. Fed.R. Evid. 601, calling for application of state law as to competency of a witness where state law provides the rule of decision, parallels almost exactly the language of Fed.R.Evid. 501 as to privileges of witnesses.[19] Both Rules defer to state evidentiary

---

18. Ill.Rev.Stat. ch. 110, ¶ 8–201 provides, except for circumstances inapplicable to this case:

Dead–Man's Act. In the trial of any action in which any party sues or defends as the representative of a deceased person ... no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased ... or to any event which took place in the presence of the deceased....

19. Fed.R.Evid. 601 provides:

Every person is competent to be a witness except as otherwise provided in these rules.

However, in civil actions and proceedings, with respect to an element of a claim or a defense as to which the State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law.

Compare that locution with Fed.R.Evid. 501:

However, in civil actions and proceedings, with respect to an element of a claim or defense to which State law supplies the rule of decision, the privilege of a witness, person, government, State or political subdivision thereof shall be determined in accordance with State law.

standards when state law supplies the rule of decision, but neither deals specifically with what evidentiary rule prevails when a case involves both federal and state claims. However, the Judiciary Committee Notes to Fed.R.Evid. 501 discuss that issue directly:

> If the rule proposed here results in two conflicting bodies of privilege law applying to the same piece of evidence in the same case, it is contemplated that the rule favoring reception of the evidence should be applied. This policy is based on the present rule 43(a) of the Federal Rules of Civil Procedure which provides:
>
> > In any case, the statute or rule which favors the reception of the evidence governs and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made.

In the face of the silence of both the courts and Rule 601's drafters on what to do in a case that embraces both federal and state claims, this Court finds the reasoning of the Judiciary Committee to be equally persuasive as to the issue of witness competency as it is to privilege. Therefore the testimony as to Cole's statements and activities is admissible.

### 3. *Admissibility of Affidavits of Etta Cole and Curt Bergquist*

Defendants have moved to strike affidavits of two plaintiffs—Etta Cole, Cole's widow and executrix of his estate, and Bergquist.[20] Defendants' asserted ground is that the witness' affidavits (respectively "E. Cole Aff." and "Bergquist Aff.") contradict their previously sworn answers to supplemental interrogatories ("Ints."). ˙

It is well settled that in determining whether a material issue of fact exists a court may not exclude consideration of an affidavit simply because of some conflict with the affiant's prior sworn testimony (see 6 (Part 2) *Moore's Federal Practice* ¶ 56.22[1], at 56–756 to 56–757 (1988 ed.)). But that proposition cannot be invoked to defeat the purpose of summary judgment by allowing parties to create genuine issues of fact simply by contradicting their own prior sworn statements on a central issue (see such cases as *Richardson v. Bonds*, 860 F.2d 1427, 1433 (7th Cir.1988) and cases cited there; *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986)). While all the cases that have come to this Court's attention deal with affidavits in conflict with prior *deposition* testimony, there is surely no reason to treat answers to special interrogatories as less deserving of credence than depositions.[21]

Those two principles identified in the preceding paragraph look in opposite directions. To reconcile them in any case, a court must take a close look at the earlier testimony (or here the supplemental interrogatories) in juxtaposition to the objected-to affidavits, to determine both the existence or nonexistence, and the extent, of any conflict between the two.

As for Etta Cole, defendants clearly over-read her affidavit in an effort to posit extensive contradictions of her supplemental interrogatory answers, rather than the limited conflict that really exists. Defendants maintain that E. Cole Aff. ¶¶ 7–10 and 18–19 attempt to establish Nortman's and Berrettini's expertise in oil and gas matters via factual information that should have been disclosed in answers to numerous supplemental interrogatories (those in-

---

**20.** More accurately, Bergquist is a principal in BGB Investments, an investor in each of the four COPCO programs.

**21.** Indeed, in some ways the principle last stated in the text ought to apply with even greater force where interrogatory answers are involved. Unlike deposition testimony, which may be spur-of-the-moment and unstudied, interrogatory answers are formulated at leisure with the aid of counsel. That point is particularly apropos here, where plaintiffs' answers to defen-

dants' first round of interrogatories were so uninformative as to result in defendants' request to depose all plaintiffs. Plaintiffs' counsel found that request overwhelming, and the parties instead agreed to the use of supplemental interrogatories. When answered, such interrogatories would enable defendants to decide which (if any) additional plaintiffs they needed to depose. In essence, then, the answers to the supplemental interrogatories were to serve in large part as proxies for depositions.

terrogatories had requested the factual basis for the Complaint's allegations that defendants *knowingly* misrepresented technical aspects of the program).

E. Cole Aff. ¶¶ 7–10 and 18–19 certainly convey information suggesting that Nortman and Berrettini had a degree of knowledge of geological and technical aspects of oil and gas drilling. But the affidavit nowhere states that Etta Cole had personal knowledge that either Nortman or Berrettini *knew* any of the technical misrepresentations to be true at the time they were made—and that was the information specifically requested by the supplemental interrogatories. Cole's affidavit suggests that Nortman or Berrettini or both *could have* known that the technical information was false. However, the question as to their possible (rather than actual) knowledge was not posed to her by the supplemental interrogatories. Thus her affidavit is totally consistent with her interrogatory responses on the point of knowing technical misrepresentations.

Similarly E. Cole Aff. ¶ 30 in no way contradicts her interrogatory responses. E. Cole Aff. ¶ 30 states that through her legal practice she was aware of an old scam in the oil and gas industry of dry well drilling, where sponsors would intentionally drill dry wells and make money off of the drilling process. That paragraph goes on to state that in 1984 she did not think that COPCO was that kind of scam. While that carries the negative implication that she now thinks COPCO *was* that kind of scam, what she may now suspect is no credible evidence of anything—and in any event it does not contradict her interrogatory reponses, which state that she had no personal knowledge of wrongdoing.

Finally defendants maintain that E. Cole Aff. ¶¶ 25–29 contradicted her sworn negative answers to Ints. 27(a) and 28(a), which asked for personal knowledge of misappropriation and commingling of partnership funds by defendants, and to Int. 42, which requested personal knowledge of any other wrongful acts. But E. Cole Aff. ¶¶ 25–26 and 28 merely report what Arnold had said to Etta Cole about the alleged financial quarrels between COPCO and Ona, her suprised reaction to that information and her later insistence that an escrow be opened for COPCO-1, –2 and –3 as a condition to the continued offering of COPCO-4—none of which items goes to her personal knowledge of misappropriation or commingling of partnership funds.

However E. Cole Aff. ¶ 27 says that Nortman told her directly that he did not want to send back to Texas some money that he considered to be his advance on profits. There can be no doubt that at the time she considered that to be an admission of wrongdoing on Nortman's part—E. Cole Aff. ¶ 28 states expressly that she told Nortman that in her opinion such activity was "completely improper." Furthermore, E. Cole Aff. ¶ 29 states that Bridges told her he had sent the money in question back to Chicago at the insistence of Nortman and Berrettini, a fact that at the very least must be considered to have raised serious doubts in her mind as to the possibility that Nortman and Berrettini were innocent recipients of ill-gotten rewards.

In that light, no justification appears for the total silence, in Etta Cole's answers to the supplemental interrogatories, on this subject. Ints. 27(a) and 28(a) asked:

27. a. Do you have any personal knowledge that defendants intentionally misappropriated plaintiffs' funds and used them for personal, rather than partnership, purposes in breach of their fiduciary duties.

28. a. Do you have any personal knowledge that defendants intentionally commingled plaintiffs' funds with other funds in breach of their fiduciary duties.

Etta Cole objected to both those interrogatories as calling for legal conclusions, but she then proceeded to answer "No" to both questions. She now maintains the interrogatories were poorly drafted to the extent that they called for knowledge of defendants' state of mind as such, as well as knowledge of defendants' state of mind as to the legal conclusion (that they were intentionally breaching their fiduciary duties), and that under those circumstances the only possible answer was "No".

That contention is unpersuasive. Defendants' use of the word "intentionally" in those questions plainly refers to the claimed misappropriation and commingling,[22] and it requires considerable stretching of the language to extend the inquiry to knowledge whether the breach of fiduciary duties was also intentional. Moreover, it is of no moment that the questions contemplate a legal conclusion: Etta Cole is a lawyer to whom the concept of fiduciary duty must be familiar, rendering the objection of no merit in her situation.

In substantive terms, her affidavit does not refer to any commingling of funds and thus does not conflict with Int. 28(a)—but there can be no question that information contained in E. Cole Aff. ¶¶ 27–29 shows that she did have personal knowledge of the assertedly intentional misappropriation of funds at the time she answered the interrogatories but failed to say so. If in fact she didn't think the information she now recites in her affidavit was responsive to Int. 27(a), she certainly should still have included it in her response to Int. 42 (which asked for information regarding any other wrongful acts were not the subject of previous interrogatories). In sum, E. Cole Aff. ¶¶ 27–29 clearly conflict with her answers to the supplemental interrogatories.

As for Bergquist, he too contradicted his supplemental interrogatory responses with his later affidavit. Bergquist Aff. ¶ 8 states:

Nortman admitted to me that he had taken as profits, large portions of investors funds prior to the completion of the program. Nortman insisted that these funds belonged to him and Berrettini, referring to them as "their profits" and admitted that they had gained control, in some complicated fashion, of $195,000 of investor funds that had been sent to Texas. He also admitted that the money had been used for non-partnership purposes such as the purchase of an expensive computer system for COPCO and car phones.

It is hard to imagine information that would be more directly responsive to Ints. 27(a) and 28(a). Bergquist also objected that those questions called for legal conclusions but then answered "No" without waiving the objection. Even giving Bergquist the benefit of the doubt that he was not obligated to answer questions that called for legal conclusions, he still had an obligation to provide the defendants with his personal knowledge of the claimed wrongdoing in his answer to Int. 41. And to that extent Bergquist Aff. ¶ 8 definitely conflicts with his previous sworn answers to interrogatories.

■ Where as here a conflict exists between an affidavit and previous sworn testimony, *Franks*, 796 F.2d at 1237 (citations omitted) teaches that courts should "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." *Franks*, id. enumerates the factors relevant to making that determination:

whether the affiant was subject to cross-examination when making the earlier sworn statement, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.

Application of those factors to the present situation strongly counsels in favor of barring the conflicting portions of the affidavits. Because cross-examination is unavailable by definition in the case of written interrogatories, that factor does not literally apply—but as already explained, the opportunity for time and thought in preparing interrogatory responses makes the later change of position in an affidavit even more suspect. As for the second factor, it is abundantly clear that both Etta Cole and Bergquist had access to the information later included their affidavits at the earlier time that they answered the interrogatories—yet they both

**22.** In each instance that latter term has the word "intentionally" as its immediate antecedent.

provided unequivocal statements that they had no such information. And as for the final factor, neither affidavit attempts to explain the total absence of any reference to the pertinent information in the interrogatory responses. It is striking indeed that when they answered the special interrogatories posed to them by defendants, neither Etta Cole nor Bergquist ever mentioned what, if their present affidavits are to be credited, amounted to direct admissions by their party opponents of conduct at the very core of this lawsuit. To be sure, Nortman and Berrettini have said money was transferred to and from Texas and Chicago in what they contend to be aboveboard transactions between themselves and Ona and Bridges—but both Etta Cole and Bergquist now claim to have been told things far more damning than that. Under the circumstances the conflicting portions of the affidavits, but only those portions, must be and are stricken.

### Fraud–Based Claims

#### 1. Expert Witness Testimony

Defendants claim that key allegations in this case can be proved only by expert testimony and that plaintiffs' failure to identify expert witnesses in the course of discovery must prove fatal to their case. Although the allegations in this case do require expert testimony, plaintiffs have in fact produced such testimony from witnesses Stovall, Cook and Trimble—all of whom qualify as experts in the oil and gas field under Fed.R.Evid. 702. It is true that plaintiffs did not identify those witnesses as experts in answering defendants' interrogatories. However, the interrogatories specifically asked whether plaintiffs had "retained" any expert witness, and none of those people had been "retained"—instead they were fact witnesses with an expertise in the relevant technical areas. According-

**23.** This Court does not excuse a party's failure to designate witnesses in answering interrogatories or final pretrial orders calling for witness identification just because the other party knows about the existence of those people (either because they have been mentioned in deposition testimony or otherwise). Hence plaintiffs' added argument based on such knowledge

ly defendants' objection on that score is rejected.[23]

#### 2. Plausibility of Plaintiffs' Theory

■ As their first substantive line of defense, defendants rely on the teaching in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) that the plausibility of an alleged illegal scheme must be considered in determining a summary judgment motion. *Matsushita* does not hold that plausibility alone can determine a summary judgment motion but rather (*id.* at 587, 106 S.Ct. at 1356):

> [I]f the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary.

While *Matsushita* was concerned with antitrust law, which has a peculiarly economics-based footing, the fundamental idea that the economic and practical rationality of an alleged scheme must frame a court's consideration of the proffered evidence in a summary judgment setting has equal force outside of the antitrust arena.

Defendants identify several factors as assertedly demonstrating the implausibility of plaintiffs' theory:

1. Neither Nortman nor Berrettini nor COPCO made money on any of the limited partnerships. On the contrary, Nortman and Berrettini ended up losing substantial amounts of money before the programs finally came to a halt. Specifically, Nortman and Berrettini received no salary for their work.

2. Defendants spent substantial funds not specifically called for by the PPMs in trying to make the programs successful, with no possibility of reward

on defendants' part would not help them if plaintiffs had not prevailed for the reason discussed in the text. Nonetheless, plaintiffs do point out that all three witnesses are somehow connected to the facts of this case and that their existence was previously known to defendants as well as to plaintiffs.

except to the extent that all investors would gain from revenue producing wells.

3. Nortman's father was an investor.

4. Defendants repeatedly invited the investors and their representatives, Interbanc and its employees, to come to Texas and survey their investments.

5. Nortman, Berrettini and COPCO were at odds with, not in cahoots with, Bridges and Ona.

In short, defendants maintain all those factors are totally inconsistent with plaintiffs' only fraud theory—that the COPCO programs were a dry hole drilling scam from day one.

Plaintiffs retort:

1. While Nortman and Berrettini did not receive salaries, they did manage to get their hands on large amounts of investors' funds. That proves they were operating COPCO as a partnership in corporate form and taking money out of the corporation by means other than through salaries.

2. Funds provided in excess of those required by the PPMs were expended to protect the Nortman–Berrettini investment in the project (that being their share of the profits from the drilling activity) and to conceal the fraudulent activities that were the basis for the program at the outset.

3. Nortman's father purchased only a half unit, had his 10% commission returned to him and was later bought out by COPCO.

4. Defendants' invitation to investors to go to Texas was a "calculated risk" because investors were unlikely to incur the expense and inconvenience and, even if they did, lacked the knowledge to make a tour of the wells a useful exercise.

5. No dispute arose between Nortman–Berrettini on one side and Bridges on the other until the spring or summer of 1984—after three programs had been completely sold and the fourth was being actively marketed. At that point Bridges outflanked Nortman and Berrettini and made off with the spoils in which the latter two expected to share.

All that, plaintiffs urge, at least creates a material factual issue as to defendants' fraudulent intent from the outset.

It is always dangerous to view alleged fraud from an ex post perspective, when the fact of a failed venture may color bona fide conduct and judgments that ultimately proved mistaken. But even from such a vantage point plaintiffs' theory lacks plausibility. While they are correct in noting that the ultimate chill in relations between Nortman–Berrettini and Bridges has no bearing on whether those three had in fact conspired to defraud the investors at the outset, and also that Nortman's father's insignificant participation in the program proves nothing, the other factors cited do cast a spectre of implausibility over plaintiffs' theory.

It rings hollow to suggest that Nortman and Berrettini expended funds, which they were in no way required to provide, simply in an effort to protect their "investment," when that interest is defined as protecting their profits from the drilling of the wells. Because the drilling contracts were turnkey arrangements, their spending extra amounts on other efforts to make the already-drilled wells successful could not realistically be expected to extend or enhance the profits to be made from the contracts. Instead the only result, if the wells were in fact known to be dry, would be to *deplete* the profits that Nortman and Berrettini could expect to walk away with at the completion of their fraud—hardly something that profit-minded crooks would volunteer. It is equally nonsensical to think that they would dissipate the profit from their fraud in an attempt to cover it up. If they knew the wells were dry, then only the continual spending of money until they ran out of funds would hide their tracks— leaving them with no fruits of their crime and a mob of angry investors. Knowing that the only money they stood to make from their fraud was the drilling contract profits, they would have no incentive to spend even a dime of that on a coverup that had no possibility of success. It may be human nature to want to put off the

moment when one must face the music for a wrong he or she has committed, but when the object of that wrong was to make money it is ludicrous to think of offering up that money simply for the privilege of hiding a short time longer.

As for plaintiffs' attempt to dismiss defendants' invitations to the investors to come to Texas and to inspect their investment as a "calculated risk," that assumes without any support that none of the investors had any knowledge of the oil and gas industry and that defendants were aware of that. It also assumes that no one would incur the expense and inconvenience of a trip to Texas regardless of the amount of money invested. Neither of those assumptions rises to the level of the reasonable inference to which plaintiffs, as targets of a summary judgment motion, are entitled. Instead the invitation extended to investors and their representatives at Interbanc does cut against the theory that Nortman and Berrettini were scheming to keep investors in the dark about what defendants knew to be the noncommercial nature of the projects.

Nonetheless it would be risky business to cut plaintiffs' claims off at this threshold stage of the inquiry based on the perceived illogic of their theories of defendants' motivation. Implausibility is not the same as impossibility, and while *Matsushita* clearly teaches that the rationality of a litigant's claim must set the stage for considering a summary judgment motion, fundamental principles of fairness teach that it cannot do more than that. This opinion's "Hunt for Red October"—for defendants' potential liability—must go on.

3. *Misrepresentations and Omissions* [24]

(a) Competitive Nature of the Turnkey?

Three separate allegations of fraud relate directly to the turnkey price for drilling and completing the wells:

1. All four PPMs misrepresented the turnkey price to be competitive (Complaint ¶ 14(a)(1), (b) and (c)).

2. All four PPMs failed to disclose that the turnkey price was grossly in excess of the actual drilling costs of work performed (Complaint ¶ 15(a)).

3. All four PPMs also did not disclose that the turnkey price was insufficient to perform all work necessary to make the wells commercially productive (Complaint ¶ 15(g)).

Each of those matters will be dealt with in this section.

Defendants' first contention—that those three allegations are internally inconsistent—can be disposed of quickly. Quite to the contrary, it is entirely possible for the turnkey price to have been non-competitive (too high) as well as insufficient to make the wells commercially productive (too low). Plaintiffs allege (a) they were falsely told they were paying the going rate for drilling and completion of wells and (b) they were fraudulently *not* told that more than drilling and completion would be required to make the wells commercially productive. Those allegations are not inherently at odds.

But a substantial problem does plague the second of the three omission allegations identified above—the claimed failure to state in the PPMs that the turnkey prices set were grossly in excess of the actual work performed. After all, when each PPM was drafted, by definition no work had been performed! And if Complaint ¶ 15(a) meant to say instead that defendants failed to disclose that the turnkey cost was grossly in excess of the drilling work *expected* to be performed, plaintiffs still have a problem. All the PPMs clearly explained the nature of a turnkey contract—one in which a fixed price is set with the expectation that the contractor "will be entitled to retain the amount by which the Turnkey Contract price may exceed its [the

**24.** Both sides' memoranda addressed the issue of scienter before discussing the alleged misstatements and omissions that underlie the fraud-based claims. This opinion declines to follow their lead, adhering instead to the more common approach of first identifying and dis-cussing the alleged misstatements and omissions. For the same reason, any arguments as to issues of scienter raised by the parties in their discussions of the misstatements and omissions will be reserved for consideration in the later section specifically devoted to that issue.

contractors'] cost of drilling and completion" (PPM–1 at 19, PPM–2 at 20, PPM–3 at 19, PPM–4 at 18–19). In addition the PPMs said the turnkey price "is intended to guard against the cost of overrun in the drilling of the partnership wells and to allow substantial profit to ONA" (id.). Thus the PPMs clearly spelled out the possibility, even the likelihood, that the turnkey price was substantially in excess of actual expected costs. There can be no genuine issue of fact on that point.

Defendants cannot, however, rely on the same portion of the PPMs to contradict plaintiffs' charge of a misrepresentation that the turnkey price was competitive for the surrounding area. True enough, all the PPMs do say "[t]he Turnkey Contract price ... may not be a competitive price for the Prospect area achieved through negotiations with an independent third party" (PPM–1 at 47, PPM–2 at 48, PPM–3 at 49, PPM–4 at 46)—and at three different locations each PPM further says "[i]t is possible that the Turnkey Contract price with ONA may be at a higher (or lower) price than one achieved through negotiations with an independent third-party driller" (PPM–1 at 4, 19, 28; PPM–2 at 4, 20, 29; PPM–3 at 4, 21, 30; PPM–4 at 4, 19, 28). But everywhere the latter statement appears it is *immediately* followed with an affirmative representation:

> However, the General Partner represents that the Turnkey Contract price is competitive for the Prospect area.

Under those circumstances, surely a genuine issue of fact exists as to whether a reasonable investor would read the PPMs as representing that the turnkey price was competitive.

Even accepting that proposition, defendants claim that no actionable misrepresentation was made because all the evidence indicates the price was, in fact, competitive. But plaintiffs have clearly offered enough evidence to raise an issue of fact on that point:

1. Both John Cook and Robert Stovall have sworn that approximately $24,000 was the competitive price for drilling shallow wells at the time of the COPCO projects (Cook Aff. ¶¶ 8–9 [P.Ex. D], Stovall Dep. 46–48 [P.Ex. I]).

2. Defendants' own files contained an operating agreement from a 1981 drilling project, with Bridges as the driller in the COPCO area, at a $24,000 per well price (P.Ex. G at 19).

Defendants quibble with the assumptions made by Cook in reaching his estimated price and with what they maintain is the incomplete report of Stovall's testimony on the turnkey subject, but they fail to establish that plaintiffs could offer no evidence from which a jury could determine that the contract price was non-competitive.

(b) Likelihood of Successful Drilling

Plaintiffs assert that the PPMs falsely represented that there was a likelihood of successful drilling when in fact there was no likelihood that drilling would result in either (1) the location of hydrocarbons generally or (2) the location of hydrocarbons in amounts sufficient to generate a profit. Defendants counter that the PPMs, replete as they were with cautionary language, could not possibly be read as assuring the likelihood of success.

> Each PPM did contain explicit warnings: Although the principals of the General Partner believe that there is a likelihood that the drilling efforts will be successful, it should be noted that the acreage is still exploratory in nature with no proven or developmental wells in close proximity (PPM–1 at 18).

> \* \* \* \* \* \*

> Prospective Limited Partners should understand that it is extremely difficult to predict returns from any oil or gas drilling program, and it is possible that no wells drilled by the Partnership will produce any oil in commercial quantities ... (PPM–1, –2, –3 and –4 at 5).

> \* \* \* \* \* \*

> Oil exploration is speculative in nature.... There is no assurance that Participants will recoup any part of their investment (PPM–1 at 47, PPM–2 at 48, PPM–3 at 50, PPM–4 at 46).

> \* \* \* \* \* \*

While the General Partner believes there is a possibility of discovering oil in commercial quantities, there is a substantial risk that no oil will be discovered in sufficient quantities to merit production (PPM–1 at 48, PPM–2 at 49, PPM–3 at 50, PPM–4 at 46).

As cautionary as those typical caveats may have been, it is not impossible for them to have been actionable misrepresentations. Plaintiffs point to Cook Aff. ¶¶ 5–9 and 24–32 to argue that in fact there was *no* possibility of finding hydrocarbons in any meaningful quantity, so that *any* indication by defendants, no matter how guarded, that there was even a chance at successful drilling was a misstatement. Because defendants' only counter to Cook's testimony is contradictory testimony of their own sources, a classic question of fact exists as to whether defendants misstated the matter.

(c) Sufficiency of Funds Raised

Complaint ¶ 14(a)(3), (b) and (c) allege that all four PPMs falsely represented that the funds raised would be sufficient to complete the wells to the level of commercial production. Plaintiffs contend that given the absence of any chance of successful drilling, no amount of money would have been sufficient to make the wells into commercial propositions. While there is no flaw in that logic, plaintiffs have pointed to no statements in any of the PPMs representing that the funds raised would be sufficient to make the project a commercial success. This Court's independent review of the documents has likewise uncovered no such statement. No genuine issue of fact exists as to whether defendants made misstatements in that regard.

(d) Fair Consideration of Completion of Wells

Complaint ¶ 14(a)(4), (b) and (c) allege that all four PPMs falsely represented that a "fair consideration" would be made by defendants as to whether or not the drilled wells should be completed. Relatedly Complaint ¶ 15(c) claims "Defendants knew or had reason to believe that all the wells would be drilled, as if completed, to ensure

that Defendants' profits would be enhanced." This Court concurs in defendants' surmise that the confusing last-quoted language intends to allege that defendants failed to state that they intended to complete the wells under any circumstances, so that they could maximize their profits while squandering investment funds.

Nowhere did the PPMs actually state that "fair consideration" would be given to the completion of the wells. But each document expressly said the partnership wells would be completed only "if merited," "as merited" or "as appropriate" (PPM–1, –2, –3 and –4 at 1, 3). Plaintiffs claim that COPCO did not perform the kind of testing that, according to Stovall (Stovall Dep. 40–46), was standard in the industry for determining the potential productivity of wells. As a result, plaintiffs say, all the wells were completed despite the fact that such completion was not "merited" or "appropriate" in objective terms.

By crediting Stovall a factfinder could reasonably determine that the completion of virtually all of the wells despite COPCO's failure to engage in standard forms of testing shows that no "fair consideration" was given to such completion—and could even infer that total completion was intended from the inception of the programs. Hence a genuine issue of fact exists as to those allegations.

(e) Developmental Nature of COPCO–2, –3 and –4

Complaint ¶ 14(b)(1) alleges that PPM–2, –3 and –4 falsely represented that the wells in those programs would be drilled on "developmental" acreage. Correspondingly Complaint ¶ 15(d) alleges that those PPMs also omitted to state that the term "developmental," commonly employed in the oil industry to denote relatively low-risk drilling prospects closely adjacent to commercially producing wells, could not be used fairly and accurately in connection with the COPCO programs.

Little time need be spent on the second objection. It is a complete answer to note that the PPMs specifically defined the term "developmental wells" as used in the Part-

nership Agreements, so that the meaning of that term as commonly used in the industry is irrelevant.

Plaintiffs' first contention presents a more complex semantic issue. PPM–2 at 47, PPM–3 at 48 and PPM–4 at 44–45 contain the following language:

> *Developmental Drilling.* The Partnership Drilling Area is considered developmental due to the close proximity of actual producing oil wells and the geological data provided in Exhibit E. No assurances whatsoever can be given that oil will be discovered in the Partnership wells, or if discovered, that production will be in such an amount that it will be profitable to complete the wells or that the projected production estimates will ever be met.

Plaintiffs maintain that the reference to producing wells must be read as meaning commercially productive wells—the only type of producing wells that would be of interest to investors. And because no COPCO–1 wells were commercially productive, the argument goes, use of the term "developmental" was misleading.

But statements elsewhere in PPM–2 and –3 foreclose any such reading. In the section titled "Developmental Drilling," describing drilling activity in COPCO–1 at that time, PPM–2 at 22 and PPM–3 at 23 state:

> The quality and the magnitude of the wells is unknown at this time and no assurance can be given that any of such wells will produce oil on a consistent ongoing basis.

That renders untenable any attempt to read the concept of commercial production into the provided definition of "developmental."

Plaintiffs finally contend that use of the term "developmental" in the PPMs would lead an ordinary investor into thinking the wells were relatively low-risk when they were not. But the PPMs never describe the developmental programs as being relatively low-risk. Rather they simply state (PPM–2 and –3 at 12, PPM–4 at 11):

> The classification of Prospects as Developmental, does not assure success in drilling activities or return on investment, but is a manner of assessing the risk and potential return prior to commencement of drilling activities.

That language cannot be fairly read as transforming the quoted definition of "developmental" into a term expressing relatively low-risk drilling. Thus plaintiffs have offered no evidence tending to show that the use of the specifically defined term "developmental" was inappropriate in PPM–2, –3 and –4.

(f) Previous Wells Completed and Producing

Complaint ¶ 14(b)(2) alleges that PPM–2, –3 and –4 falsely stated that previous wells drilled on the same acreage were completed and producing. PPM–2 at 22 and PPM–3 at 23 say:

> As of the the date of this Offering, eight wells have been drilled and two have been completed on the same 304+ acres where the Partnership's wells will be drilled. These wells are still at the early stages of production and although the two completed wells currently producing 8–12 barrels per day, the actual production amount cannot yet be determined.

COPCO's October 3, 1983 letter to investors reported that eight wells had been drilled, two of which had been completed and were anticipated to be in production within the next two weeks. But nowhere in the statement of undisputed facts or in any other documentation has this Court found substantiation that those wells were in fact producing any amounts at all before the October 25, 1983 issuance of PPM–2 and the November 17, 1983 issuance of PPM–3. Because of defendants' failure even to assert such production in their statement of facts, a genuine issue of fact exists on the question whether wells were indeed producing at the relevant time.

Similarly PPM–4 at 21 states:

> As of the date of this Memorandum, 28 wells have been drilled by Ona for the 3 prior COPCO programs, and several are pumping oil into tanks. Several others are in various stages of completion. It appears that oil is present in all 28 wells,

but no assurance can be given that such production will be in commercial quantities.

Plaintiffs offer no evidence that each of those drilled wells was not in some stage of completion as of March 15, 1984, the time that COPCO–4 was offered. But they have shown, and defendants have admitted, that the only evidence that wells were pumping oil into tanks (the purported pick-up by Scurlock Oil company) did not in fact support that contention—for the pick-up was of frac, not real, oil. Under those circumstances a genuine issue of fact exists as to whether PPM–4 falsely stated that several wells were pumping oil into tanks.

(g) Successful Prior Drilling by COPCO

Complaint ¶ 14(b)(3) alleges that PPM–2, –3 and –4 all falsely represent that there had been successful prior drilling activities by COPCO. No such representation appeared anywhere in PPM–4, and thus no issue of fact exists on that score as to that particular PPM. On the other hand, both PPM–2 at 22 and PPM–3 at 23 directly refer to the "successful prior drilling activities of the General Partner." Defendants attempt to limit the scope of that statement by arguing that the term "successful" as used in that context refers only to the earlier statement that all the wells drilled showed "positive signs of the existence of oil although the quantity and quality are unknown at this time" (*id.*). Under that formulation, defendants object that plaintiffs have not shown that such positive signs did not exist and therefore there was no misstatement.

Common sense dictates the failure of that argument. "Successful," unlike the term "developmental," was never specially defined in the relevant PPMs—it has a common usage that could well cause an investor to infer that its use in context indicated real commercial or financial success, not simply "positive signs" of potential oil. Thus a factfinder could determine that the statement of previous success was indeed misleading.

(h) Favorable Reports of Past Drilling Activity in Area

Complaint ¶ 14(b)(4) alleges that favorable reports of past drilling activities in the area were misleading, as they were not relevant to the possible success of the Limited Partnerships. Defendants maintain that not one witness has contested the fact that drilling in the Corsicana Wolf City formation had been successful in the immediate vicinity of the COPCO fields, as indicated by the information included in the PPMs (PPM–1 at 12–18, PPM–2 at 13–18, PPM–3 at 13–18, PPM–4 at 11–16).

That is not true. Cook's affidavit, when read as a whole, implies that while the geology of the area had supported successful past drilling endeavors, the very existence of those past successes had rendered the area substantially depleted—thus making the inclusion of those earlier favorable reports misleading. Those earlier favorable reports had also been based on an economy in which oil prices were substantially higher than at the time of the COPCO projects and drilling prices were lower than those being used by COPCO. In that light, an issue of fact certainly exists as to whether the inclusion of information about prior successful drilling was misleading in the specific context of this project.

(i) Wells Pumping Oil into Tanks

Complaint ¶ 14(c)(1) alleges that PPM–4 falsely represented that several prior wells were pumping oil into tanks. That issue has been addressed in Section 3(f), and the result reached there applies again here.

(j) Previous Wells in Various Stages of Completion

Complaint ¶ 14(c)(2) alleges that PPM–4 falsely stated the various stages of completion of the 28 wells in the three earlier programs. Defendants understandably misunderstood the Complaint's admittedly ambiguous language as questioning whether those wells were in any stage of completion, but P.R.Mem. 39 clarifies the objection as relating to the degree of completion of those wells as represented in PPM–4 Ex. E. On that score Donohoe Aff. ¶ 4 (P.Ex.

Y), stating that in December 1984 he personally observed that the wells were not in the advanced state of completion that Exhibit E suggested, is enough to raise a genuine issue of fact.

### (k) COPCO–1 a Failure

Complaint ¶ 15(e) alleges that PPM–2, –3 and –4 all fraudulently omitted to state that COPCO–1 was a failure at the time of the later offerings. Plaintiffs have offered absolutely no evidence tending to show that COPCO–1 was a failure at the time any of those PPMs were drafted. Plaintiffs' own expert Stovall had reported as late as April 1986 that he believed COPCO–1 could be made into a paying venture. That Stovall *later* changed his assessment in that regard (see Stovall Aff. ¶¶ 3–7 [P.Ex. K]) in no way speaks to the reasonable assessment of the program at the time of drafting the PPMs.

### (1) Useless Geological Reports and Evaluations

Complaint ¶ 15(f) alleges that all four PPMs omitted to state that the geological reports and evaluations contained in them were of no use whatsoever. In the same vein, Complaint ¶ 16(c) alleges that defendants compounded and furthered their alleged scheme by preparing geological reports that were without merit in relation to the economic potential of the proposed wells. Defendants counter that plaintiffs have proffered no evidence that the geological reports were in any way inaccurate and misleading.

But Cook Aff. ¶ 32 does raise questions at least as to the geology report attached to PPM–4, and to that limited extent P.R. Mem. 40 correctly asserts:

> [T]here *is* expert evidence available showing that the geology reports both contained in the PPMs and otherwise presented to the investors were useless because the reports contained only general information and failed to address the

specific prospects on which the partnership wells were being drilled.

Though relatively meager, that suffices to create a genuine of fact as to the viability of that one geological report. However, this Court's independent review of the record has failed to identify any other evidence raising a similar issue as to the geology reports contained in the other PPMs. For that reason plaintiffs' unsupported conclusory allegations fail to create an issue of fact as to the viability of those reports.[25]

### (m) Favorable Reports

Complaint ¶ 16(a) also contends that defendants compounded and furthered their alleged scheme by issuing favorable reports not based on true facts. Specifically plaintiffs allege (1) the October 3, 1983 report misrepresented that production was in excess of projections and revenues would be generated in the near future; (2) the December 7 and December 13, 1983 reports misrepresented that oil production would commence on December 15, 1983; (3) the February 1, 1984 report misrepresented that production was in excess of projections and additional favorable geological data had been obtained.

In all those respects, the damning statements of both Cook and D'Abre raise serious questions as to the accuracy of the challenged reports (Cook Aff. ¶¶ 24–32 [P.Ex. D], D'Abre Statement 16–20 and 28–33 [P.Ex. E]). Nothing daunted, defendants urge that each report merely reflected *opinions* that are not actionable.

Despite the cautionary language ("we anticipate," "we are cautiously optimistic") in which those "opinions" are couched, they purport to be based on actual information from the field. As such they convey that the activity in the fields at the least suggested the "opinions" were rationally grounded in some actual fact. That being the case, the statements easily could have contributed to the fraudulent scheme as alleged. There is a genuine issue of fact as to those misrepresentations.

---

**25.** This Court recognizes and has honored its independent obligation to comb the record for evidence raising genuine issues of fact in the summary judgment setting. But that is really counsel's obligation in the first instance, and it seems an unwarranted imposition to shift that burden to the court.

#### (n) Bogus Cash Distributions

Complaint ¶ 16(b) alleges that defendants compounded and furthered the alleged scheme by making bogus cash distributions to investors in or about April 1984 to entice them to believe in the probable success of the programs. Defendants have already admitted that the oil pick up that prompted the cash distribution was of frac and not regular oil (D. 12(1) ¶ 145). Thus the distribution was not in fact what it purported to be. Whether or not that action was undertaken knowingly is a question of state of mind addressed later in this opinion.

#### (o) Field Substantially Depleted

Finally, Complaint ¶ 16(d) alleges defendants compounded and furthered their scheme by not disclosing that the field on which the wells were drilled was substantially depleted. As already noted, Cook has said the fields were in fact depleted and that is enough to raise an issue of fact on the final contention.

#### 4. *Scienter: Nortman's and Berrettini's Knowledge*

With plaintiffs' having surmounted the first hurdle (at least in part), it is time to examine the issue central to all of the Complaint's fraud-based claims (including the RICO counts): the idea that Nortman and Berrettini acted with knowledge and intended to engage in a fraudulent scheme. Both the federal and state fraud claims require a showing that defendants *knew* the true nature of the facts at the time they made the challenged misstatements and omissions—the "scienter" requirement.

On the federal front *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976) has expressly left open the question whether such liability may be predicated on something less than affirmative intent to deceive. In our Circuit *Sundstrand*, 553 F.2d at 1045 (quoting *Franke v. Midwestern Oklahoma Development Authority*, 428 F.Supp. 719 (W.D.Okla.1976)) held recklessness actionable promptly after *Hochfelder* was handed down:

> [R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

More recently *Rankow v. First Chicago Corp.*, 870 F.2d 356, 367 (7th Cir.1989) has cautioned that courts should not be liberal in finding such recklessness and that mere negligence is not actionable.

*Perlman v. Time, Inc.*, 64 Ill.App.3d 190, 196, 20 Ill.Dec. 831, 836, 380 N.E.2d 1040, 1045 (1st Dist.1978) (citing *Broberg v. Mann*, 66 Ill.App.2d 134, 213 N.E.2d 89 (2d Dist.1965)) has similarly explained that under Illinois common law:

> In order to establish fraud it is necessary to show that the defendant either had knowledge of the falsity and, hence, an intent to deceive, or acted in culpable ignorance as to the truth or falsity of the assertion.

While that formulation does not use the magic word "recklessness," that certainly seems to be its import—and federal securities law claims and Illinois common law fraud claims have been characterized as embracing "virtually identical" elements of proof (*Frain v. Andy Frain, Inc.*, 660 F.Supp. 97, 99 (N.D.Ill.1987)).

Defendants' most rigorous line of defense to all the fraud claims is that each of the already reviewed substantive allegations of misstatements and omissions is tied into some technical aspect of the drilling programs for which defendants did not have primary responsibility and as to which they had very limited knowledge. It is undisputed that Nortman and Berrettini controlled the financial and administrative end of the COPCO business, while relying on Bridges and his staff to provide them with technical information. That allocation of responsibilities was fully memorialized in the PPMs, which also accurately reported that Nortman's and Berrettini's backgrounds did not include any technical training in the oil and gas business. On those

facts Nortman and Berrettini argue they had no knowledge, and indeed could not independently have discovered, that any of the technical information passed along to investors was false.

While plaintiffs scoff at defendants' claimed ignorance of the technology at issue, they fail even to create a reasonable inference that either Nortman or Berrettini possessed the requisite knowledge as to the technical information supplied to them by Bridges and his employees. This opinion will address each of plaintiffs' unsuccessful efforts in that respect.

First plaintiffs chide defendants for failing to quote in their summary judgment papers the language from the PPMs describing Berrettini's background (PPM–2 at 33, PPM–3 at 34, PPM–4 at 32):

> While with Itex Energy Corporation, Mr. Berrettini gained considerable experience and learned the economics of the field of energy.

P.R.Mem. 22 emphasizes that background, coupled with the fact that Berrettini had been "a financial and energy consultant to COPCO from its inception" (*id.*), and goes on to say:

> This fact in and of itself indicates that Berrettini had sufficient knowledge to evaluate the reports that he was receiving from the Texas and to properly evaluate what was occurring in the fields based on his own observations on his trips to Texas.

That statement is simply ludicrous: Nothing in either of the quoted statements speaks to Berrettini's knowledge of the technical side of the energy business or could be reasonably read as doing so. In fact plaintiffs themselves demonstrate the hollowness of their position through their own insistence that Cole's and Bergquist's substantial experience in the business side of the oil and gas industry did not provide them with knowledge of the technical side sufficient to put them on notice of the

problems with the COPCO programs (P. 12(m) ¶¶ 16 and 149).

Plaintiffs make essentially the same argument with respect to Nortman's statement in his October 3, 1983 letter to investors:

> Mr. Berrettini brings valuable oil and gas experience with him which will maximize your investment.

Again there is nothing to suggest that such "experience" referred to any technical expertise sufficient to evaluate the reliability of reports from the field.

Next plaintiffs make the equally tenuous argument that because the initial proposed division of labor for COPCO assigned Nortman and Berrettini responsibility for "administering and overseeing the well management and administration" (Ex. J), they must have had technical knowledge of the oil and gas industry. That simply does not follow. There is nothing in those tasks that would inherently require technical expertise, and once more plaintiffs have pointed to nothing to suggest that either individual possessed such expertise.

Unable to offer direct evidence to support the notion that Nortman and Berrettini themselves had the technical expertise to evaluate the relevant information, plaintiffs contend that is not fatal to their case. Rather they urge that Nortman's and Berrettini's attempts to lay blame on Bridges for any alleged falsities as to the technical aspects of the program is doomed to backfire upon them. According to plaintiffs, Nortman and Berrettini are tagged with imputed knowledge because they were "joint venturers" with Bridges in the drilling of the COPCO wells so that, under common principles of partnership law, they share in the responsibility for any wrongdoing by Bridges wearing his Ona hat.[26] If so, then Nortman and Berrettini are tainted by their own emphasis on Bridges' wrongful conduct.

---

26. Joint ventures are jural relationships to which the law attaches a number of legal consequences, among which is the principle (familiar in partnership law) that joint venturers are liable to third parties for the acts of any other member performed within the scope of the joint venture (*Tassan v. United Development Co.,* 88 Ill.App.3d 581, 588, 43 Ill.Dec. 769, 775, 410 N.E.2d 902, 908 (1st Dist.1980)).

*Palin Manufacturing Co. v. Water Technology, Inc.*, 103 Ill.App.3d 926, 932, 59 Ill.Dec. 553, 558, 431 N.E.2d 1310, 1315 (1st Dist.1982) (citing *Richton v. Farina*, 14 Ill.App.3d 697, 303 N.E.2d 218 (1st Dist. 1973)) identifies the elements of a joint venture:

> (a) a proprietary interest in the subject matter, (b) a community of interest, (c) a right to govern policy in connection therewith, and (d) a sharing in both profits and losses.

Nortman and Berrettini were indeed to share in the profits of Ona's drilling for COPCO, but none of the other required factors has been shown. Nothing suggests that Nortman and Berrettini agreed to share in the losses of Ona generally or—more importantly—in the partnership drilling projects specifically. Ona was a preestablished, independent corporate enterprise contracted with to perform services for the COPCO programs—Nortman and Berrettini had no interest, either proprietary or managerial, in the functioning of Ona. Neither Ona's (nor its principal Bridges') knowhow nor its (or his) wrongdoing may be laid at the door of Nortman or Berrettini under principles of vicarious liability.

That is equally true of the contention at P.R. Mem. 23 that "their control over the finance of the enterprise in relationship with Dennis Bridges" establishes Nortman and Berrettini as joint venturers with Bridges. Certainly there is evidence that Nortman and Berrettini controlled the finances of the COPCO enterprises, but that cannot be stretched to a joint venture as to the drilling of wells—a separate undertaking from the formation and operation of the partnerships generally. And as to that separate undertaking, no admissible evidence [27] has been offered to show that Nortman and Berrettini had control over how Bridges, wearing his Ona hat, chose to run the drilling or handle its finances.

This Court has elsewhere observed that in joint venture determinations the intent of the parties is the most significant factor (*BA Mortgage and International Realty Corp. v. American National Bank and Trust Co. of Chicago*, 706 F.Supp. 1364, 1371 (N.D.Ill.1989)), so that the existence vel non of a joint venture is normally a question for the factfinder (who is in the best position to determine the credibility of the witnesses). But where as here there is no conflicting evidence as to the parties' intentions and none of the other incidents of a joint venture is present, it is unnecessary to leave the question for the factfinder. Thus *Clapp v. JMK/Skewer Inc.*, 137 Ill.App.3d 469, 471, 92 Ill.Dec. 187, 189, 484 N.E.2d 918, 920 (3d Dist.1985) calls for the dismissal of joint-venture-predicated claims where a joint venture theory cannot withstand basic scrutiny. There as here the only evidence offered to show a joint venture was the sharing of profits on a percentage basis between the alleged venturers, and that was found not to justify keeping the claims alive to stand trial. That same result must obtain in the current summary judgment setting.

So plaintiffs have failed to establish scienter either by (1) direct evidence of defendants' knowledge or ability to know of the complained-of falsity or (2) a viable theory of imputed knowledge. Plaintiffs' only fallback position is that defendants' reliance on Bridges and other experts who provided them with information that defendants passed along to investors was somehow reckless, so as to provide a predicate for liability. Though that argument takes several partially articulated forms and has nowhere been completely spelled out by plaintiffs, it will be given full consideration here. Essentially the theory is this: If defendants were as ignorant of the technical side of the investment they were sponsoring as they claim, and were themselves incapable of evaluating the information provided to them, it was their responsibility to exercise a careful choice and verification of the individuals on whom they relied so completely for the crucial technical infor-

---

**27.** Only the stricken affidavit of Etta Cole suggests that any advance on profits from the drilling programs was sent by Bridges to Nortman and Berrettini at *their* direction. Thus the only admissible evidence on the subject is the uncontradicted testimony of Nortman and Berrettini that Bridges sent those funds on his own.

mation underlying the program. If defendants *recklessly* relied on those individuals, they must be held responsible to the investors for the misstatements and omissions that resulted from that reliance.

Plaintiffs object to defendants' reliance on a whole cast of characters—including Nelson, D'Abre, Edwards, Galoostian, Cole and Bergquist—but there can be no doubt that Bridges was the primary source of technical information for the programs and the individual in whom Nortman and Berrettini lodged the most trust. That reliance is the main focus of plaintiffs' objections.

It is undisputed that before moving forward with the offerings both Nortman and Berrettini inquired about Bridges from individuals involved in the Texas oil scene and received uniformly positive responses. But plaintiffs complain that defendants did not conduct an "independent review" of the "hard data having most pertinence" to their intended project in order to compare it with Bridges' representations—a course that had been followed by their expert Cook before his 1981 investment with Bridges in the contiguous area and that plaintiffs seek to establish as the standard for reasonable conduct. Two obvious problems present themselves:

1. If defendants lacked expertise to evaluate the information provided by Bridges and his company (as this opinion has concluded they did), they obviously were not in a position to conduct a meaningful independent investigation to substantiate his initial representations.

2. "Recklessness"—the lowest arguable standard for scienter—does not equate to negligence, the mere failure to take a reasonable step or otherwise exercise due care. It is well to recall our Court of Appeals' expression of the criterion in *Sundstrand,* 553 F.2d at 1045: "a highly unreasonable omission ... an extreme departure from the standards of ordinary care...."

Seeking to anticipate that latter problem, P. Mem. 3 complains of defendants' failure to seek out Cook or anyone connected with his failed drilling program in their investigation of Bridges:

> Defendants' failure to take this reasonable step inevitably leads to only two conclusions: either defendants were acting recklessly or they had already learned from other sources what the condition of Cook's wells was.

But that statement again reveals plaintiffs' confusion of the concepts of negligence and recklessness—even if defendants *had* failed to "take a reasonable step," that would not of itself lead to any inference of recklessness. Further, plaintiffs wholly fail to acknowledge an entirely non-negligent (let alone non-reckless) reason for defendants not communicating with Cook: their satisfaction with the responses they had received from Cecil Holly, Everett Sharp and Jack Smith about Bridges and the general characteristics of the drilling area—all of which had been confirmed by Cole's independent inquiries. In the total absence of any evidence showing that Nortman and Berrettini did not in fact undertake the investigations they claim to have made or that they had reason to know that their sources were unreliable, plaintiffs have failed to raise an issue of fact (even inferentially) as to any recklessness involved in their reliance on Bridges for technical information.

Such absence of any recklessness in that respect is underscored by Cook's own conduct with his own money at stake. Cook, an individual with significant technical geological experience, conducted his own inquiry into another project proposed to him by Bridges and satisfied himself as to the viability of Bridges' proposal and its potential for commercial profit—but Cook ultimately proved to be mistaken and lost significant amounts of money. It makes no sense to label Nortman and Berrettini as reckless in relying on someone who came recommended as an expert, when the undisputed facts show that a significantly more knowledgable individual undertook a similar project on the proposal of that selfsame expert.

Essentially plaintiffs' argument boils down to an assertion that because Cook

had tried and failed in a project with Bridges in the same area *before* Nortman and Berrettini undertook COPCO, they could and should have been on notice of Bridges' unreliable information and track record. But oil development is by its very nature a chancy business—it is everyday knowledge that a dry hole may be encountered in drilling cheek by jowl with a proved producing well (and vice versa), despite prior geological indications to the contrary. Unless plaintiffs come prepared to tag their own expert Cook with the "reckless" label, they cannot fairly charge defendants with that taint. This Court sees no basis in the record for doing so.

Hence plaintiffs have failed to raise an issue of fact, even in inferential terms, as to whether defendants had the requisite mental state to be liable for fraud. Accordingly every claim predicated on the existence of the allegedly fraudulent scheme must be and is dismissed: Count 1's Section 10(b) claim, Count 4's conspiracy-to-violate-Section 12(2) claim; all aiding and abetting allegations in connection with the alleged federal securities violations; Count 5's Illinois common law fraud claim; Count 7's and 8's RICO claims; and Count 9's Illinois securities law claims.

### Remaining Claims

That leaves for further consideration:

1. Count 2's Section 17(a) claim;

2. Count 4's Section 12(2) claim;

3. the unregistered securities claims of Count 3 (federal law) and Count 9 (state law); and

4. Count 6's breach of fiduciary duty claims.

Those remaining claims will be dealt with in that sequence.

### 1. *Count 2's Section 17(a) Claim*

Plaintiffs have conceded that Section 17(a) does not afford a private right of action. On the authority of *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 942–43 (7th Cir.1989), that claim is also dismissed with prejudice.

### 2. *Count 4's Section 12(2) Claim*

■ Unlike the already-addressed fraud-based claims, Section 12(2) attaches strict liability to any inclusion of an untrue statement of material fact or any omission of a material fact in a prospectus or oral communication used to offer or sell a security, so long as the plaintiff did not know of the untruth or omission (*Sanders v. John Nuveen & Co.*, 619 F.2d 1222, 1225 (7th Cir. 1980)). Section 12(2) does not require proof of defendants' *intent* to defraud. In light of the already-established genuine issues of fact as to several of the alleged misstatements and omissions, plaintiffs have done enough to survive defendants' summary judgment motion on the Section 12(2) claim. That necessitates a trial to determine whether there were in fact such material misstatements and omissions represented by the PPMs.

### 3. *Unregistered Securities Claims*

(a) Federal Law

■ Complaint Count 3 alleges that defendants sold unregistered securities in violation of 1933 Act § 5 (15 U.S.C. § 77e). Defendants counter persuasively that their offerings fall squarely within the exemption (codified at 17 C.F.R. § 230.505 ("Section 230.505")) for limited offers and sales of securities not exceeding $5 million. Section 230.505 sets out a series of specific and general conditions necessary to qualify for that exemption—all of which were met by the offer and sale of securities in the several COPCO programs.

As to the specific conditions of Section 230.505(a)(2):

1. Neither COPCO–1, –2, –3 or –4 had an aggregate offering price in excess of $5 million.

2. COPCO did not reasonably believe there to be more than 35 purchasers in any of the four programs.

In fact the aggregate offering price of the several programs was $585,000 in COPCO–1, $588,000 in COPCO–2, $588,000 in COPCO–3 and $1,500,000 in COPCO–4. And none of the four programs did have more than 35 purchasers.

And as to the general conditions of Section 230.505(b)(1):

1. COPCO provided all required information to the investors.

2. COPCO made available to each purchaser, at a reasonable time before his or her purchase of securities, the opportunity to ask questions and receive answers about the terms and conditions of the offering and to obtain any additional information possessed by COPCO or that COPCO could obtain without unreasonable effort or expense.

3. Neither COPCO nor anyone acting on its behalf offered or sold the securities by means of general solicitation or general advertising.

4. COPCO made reasonable inquiry to determine that purchasers were acquiring the securities for themselves and not for others.

5. COPCO made written disclosure to each purchaser before the sale that the securities could not be resold unless they were registered or unless an exemption form registration was available.

6. COPCO placed a legend on the Prospectus and Purchaser Agreement stating that the securities had not been registered under the Securities Act and setting forth the restrictions on transferability and sale of the securities.

7. COPCO filed the requisite Form Ds for COPCO–1, –2, –3 and –4.

All that comports with the litany of requirements for exemption.

That drives plaintiffs back to a numbers game: They maintain that the COPCO offerings should be integrated and treated as a single offering. If that were so, the undisputed evidence would be that the partnership units were sold to more than 35 purchasers, thereby rendering the exemption unavailable. *SEC v. Murphy,* 626 F.2d 633, 645 (9th Cir.1980) identified five factors to be taken into consideration in deciding whether to integrate apparently separate offerings:

(a) whether the offerings are part of a single plan of financing; (b) whether the offerings involve issuance of the same class of securities; (c) whether the offerings are made at or about the same time; (d) whether the same kind of consideration is to be received and (e) whether the offerings are made for the same general purpose.

Merely to state those factors is to negate a positive answer to the integration question here. While all four offerings were made within a 12–month period and the units of each were sold for cash, they were *not* part of a single plan of financing for the same general purpose. On the contrary, each offering raised funds for the drilling of separate and identifiable groups of wells. And the fortunes of each those four distinct groups of wells, good or bad, potentially impacted only the specific investors in each program. Nor does the fact that the different programs' wells were drilled in the same geographic location suggest that they were part of a single investment plan. To credit plaintiffs' theory would make it inordinately complex and expensive for anyone to fund, by way of limited partnerships, separate drilling programs in the same area—because by definition all such programs would have the same general purpose: to drill for oil.[28]

In sum, plaintiffs have failed to present any legitimate argument for integrating the several COPCO offerings so as to destroy the otherwise-available exemption under Section 230.505. Their claim against defendants for offering unregistered securities in purported violation of 1933 Act § 5 is dismissed.

### (b) State Law

Complaint Count 9 similarly alleges failure to register the securities in accordance with Ill.Rev.Stat. ch. 121½, ¶ 137.12 B (the "Illinois Act"). But Illinois Act § 137.5 similarly exempts from registration securi-

---

**28.** It bears emphasis that the policy reason underlying the exemption is that qualifying private offerings should not be burdened with the cumbersome requirements and inordinate expense imposed by the statutory registration procedure. And that is doubly underscored where, as here, disappointed investors seek to strain any legitimate idea of integrating distinct offerings to make the lack of registration a trap for the sponsors of those offerings.

ties sales conforming to any of the subsections of Illinois Act § 137.4. COPCO's offer and sale of securities in each of the four programs meet the exemption requirements of Illinois Act § 137.4 G:

    1. None of COPCO-1, -2, -3 and -4 was sold to more than 35 persons.

    2. None of the securities was offered or sold by means of any general advertisement or general solicitation in Illinois.

    3. No commission or renumeration paid or given on account of the sale of securities exceeded 20% of the sale price of those securities.

    4. All required filings were made and fees paid to the Secretary of State.

All the facts as to the number of purchasers and the means of sale have been described. As for the other criteria, only 10% commissions were paid to the broker-dealer and all required filings were made.

COPCO thus meets each condition required for exemption from registration under Illinois Act § 137.4 G. Plaintiffs' Illinois Act claim for the offer and sale of unregistered securities is dismissed as well.

### 4. *Breach of Fiduciary Duty Claims*

    With all of plaintiffs' federal claims having been dismissed except for that under Section 12(2), this lawsuit is drastically different both in form and substance than it was preceding this opinion. While at an earlier stage it may have appeared that common issues dominated the resolution of the federal and state claims in dispute, that is no longer true. Now plaintiffs' state fiduciary duty claims would call for a significantly broader inquiry than that required to resolve the Section 12(2) claim.

In these circumstances the teaching of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) calls for dismissal—without prejudice, of course—of the state fiduciary duty claims. *Gibbs*, id. at 726-27, 86 S.Ct. at 1139 (citations and footnotes omitted) explains why:

> It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footer reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.

That last sentence accurately describes the current posture of this lawsuit. Plaintiffs' state fiduciary duty claims are dismissed without prejudice.

### *Conclusion*

All of the claims in this action are dismissed except for Count 4's Section 12(2) claim, as to which there are genuine issues of material fact requiring resolution at a trial. This action is set for status hearing at 8:45 a.m. April 20, 1990.